FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN -2 AM 10: 20

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TRAVIS D. BARTON** | * | **CIVIL ACTION** |
| **Plaintiff** | | |
| | * | **NO. 00-0293** |
| **VERSUS** | | |
| | * | **SECTION "J"** |
| **GLOBAL MARINE DRILLING COMPANY** | | **JUDGE BARBIER** |
| **Defendant** | * | **MAGISTRATE: 5 (CHASEZ)** |

\*      \*      \*      \*      \*      \*      \*      \*

### GLOBAL MARINE DRILLING COMPANY'S
### MOTION FOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel comes defendant, Global Marine Drilling Company ("Global Marine"), and pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves this Honorable Court for summary judgment on the grounds that Global Marine has no legal responsibility for plaintiff's injury. The undisputed evidence shows that the plaintiff's accident arose because the plaintiff failed to perform the duties he was responsible for as a roustabout and/or his own negligence. For the reasons stated in the following Memorandum, Global Marine Drilling Company moves for summary judgment in its favor.



Respectfully submitted,

_____

DELOS E. FLINT, JR., T.A. (#5616)
ROBERT R. JOHNSTON (#22442)
DANIEL LICHTL (#26385)
FOWLER, RODRIGUEZ, KINGSMILL,
  FLINT & GRAY, L.L.P.
201 St. Charles Avenue, 36th Floor
New Orleans, Louisiana 70170
Telephone: (504) 523-2600
Attorneys for Defendant,
Global Marine Drilling Company

## CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing has been served upon counsel for all parties by depositing a copy of same via hand delivery on this ____ day of December, 2000.

_____

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TRAVIS D. BARTON** | * | **CIVIL ACTION** |
| **Plaintiff** | | |
| | * | **NO. 00-0293** |
| **VERSUS** | | |
| | * | **SECTION "J"** |
| **GLOBAL MARINE DRILLING COMPANY** | | **JUDGE BARBIER** |
| **Defendant** | * | **MAGISTRATE: 5 (CHASEZ)** |

*       *       *       *       *       *       *       *

## MEMORANDUM IN SUPPORT OF
## GLOBAL MARINE DRILLING COMPANY'S
## MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

The plaintiff, Travis D. Barton, allegedly injured himself on March 8, 1997 on the

ADRIATIC VII. Plaintiff, who was working as a roustabout for defendant, Global Marine Drilling

Company ("Global Marine"), claimed he hurt his left knee when he tripped on some "debris" (mop

buckets and pallets) in a walkway as he was rushing to get a stinger line for his crane operator.

(Plaintiff's depo., p. 36, 37).   Part of plaintiff's duties as a roustabout was to keep the walkway

where he allegedly tripped clear. (Plaintiff's depo., p. 53).  Consequently, the plaintiff's breach of

his duty to keep the walkway clean was the sole cause of his injury or in the alternative failing to

walk around the objects he could clearly see was the sole cause of his injury.  Relying on the

deposition testimony of the plaintiff, the Court should find that Global Marine committed no negligent act and that the ADRIATIC VII had no unseaworthy condition that caused the plaintiff's alleged injury. Thus, based upon the plaintiff's deposition, the Court should enter judgment as a matter of law in favor of Global Marine and dismiss plaintiff's Complaint with prejudice. There is no evidence against Global Marine; the case should not be allowed to go to trial.

## FACTS

Plaintiff, Travis Barton, was a roustabout employed by Global Marine. He claims he was injured between 11:00 p.m. and 11:45 p.m. on March 8, 1997, when he tripped on some "debris" in a walkway and fell on a padeye. (Plaintiff's depo., p. 36, 37). The "debris" consisted of two mop buckets and less than ten wooden pallets. (Plaintiff's depo., p. 48, 82). The padeye is a device located on the side of a walkway that is used to secure the cantilever during rig moving operations. The plaintiff was considered lead roustabout, the position below crane operator. (Plaintiff's depo., p. 76). On the day of the accident, the plaintiff's crew was involved with unloading and running casing. (Plaintiff's depo., p. 36). This was essentially a two-step process whereby casing was first offloaded from the supply vessel and placed on the main deck of the rig. Then, the crane would move the casing from the main deck to the upper pipe rack. (Plaintiff's depo., p. 36, 42). The plaintiff testified the first step of the job, unloading the casing from the supply boat, had been completed by the opposite roustabout crew. (Plaintiff's depo., p. 42). Therefore, when his crew came on tour, they were assigned to transfer the casing from the main deck to the upper pipe rack.

-2-

(Plaintiff's depo., p. 43, 44).

The plaintiff's job involved standing on the main deck and hooking up slings to the casing so they could be lifted to the upper pipe rack. (Plaintiff's depo., p. 43). He was also instructed to clean up the surrounding area between lifts. (Plaintiff's depo., p. 82, 83). The plaintiff testified that this involved picking up pallets and cleaning up grease which was on the casing. Furthermore, he was to make sure that the walkways adjacent to the main deck stayed as clear as possible, while still keeping the job of moving the casing going. (Plaintiff's depo., p. 44). This was a job that the plaintiff had done in the past and was familiar with. (Plaintiff's depo., p. 44).

The accident occurred near the end of the plaintiff's twelve hour tour. (Plaintiff's depo., p. 53). The plaintiff was standing on the upper pipe rack when one of the mooring lines to the supply vessel broke. (Plaintiff's depo., p. 36). The crane operator called for help over the P.A. system, and the plaintiff went down the stairs to the main deck level in order to get a stinger, a piece of wire used to lower another mooring line down to the rig. (Plaintiff's depo., p. 36). The plaintiff claims he was walking along the walkway on the main deck to retrieve the stinger, he tripped on some debris that had been left on the walkway, and fell, striking his left knee on a padeye used to secure the cantilever. (Plaintiff's depo., p. 36, 48).

With regard to the obstructions on the walkway on the main deck where the plaintiff fell, the plaintiff testified the previous crew had emptied out the storeroom adjacent to that walkway. (Plaintiff's depo., p. 50). They had taken soap buckets out to clean grease spills from the casing that

-3-

was being unloaded, as well as empty pallets which were going to be sent in with the supply boat. (Plaintiff's depo., p. 50). When the plaintiff's crew came on tour, they cleaned up the grease from the casing, but apparently did not clear out the walkway by replacing the buckets and picking up the pallets. (Plaintiff's depo., p. 48). The plaintiff admitted, that it was the responsibility of his roustabouts to keep walkways clear. (Plaintiff's depo., p. 53). He also confirmed that his crew was on tour for eleven hours before the time of the accident and consequently he was familiar with his surroundings. (Plaintiff's depo., p. 53).

The plaintiff testified that the walkway was not completely blocked and that there was room to move around the objects within the walkway. (Plaintiff's depo., p. 75). He admitted that a person could have walked around the objects on the walkway. (Plaintiff's depo., p. 76). Additionally, the plaintiff admitted being able to see the buckets and pallets as he approached them. (Plaintiff's depo., p. 52).

As we noted earlier, the objects consisted of two mop buckets on the walkway and fewer than ten pallets. (Plaintiff's depo., p. 48, 82). The walkway was approximately twenty to twenty-five feet away from the plaintiff when he was working on the casing. (Plaintiff's depo., p. 86). The plaintiff conceded that he had time in between hooking up loads to walk over to the walkway and put the buckets away and move pallets out of the way. (Plaintiff's depo., p. 86). He estimated the time in between his hooking up loads of casing to be approximately ten minutes. (Plaintiff's depo., p. 85).

After his fall, the plaintiff went ashore for medical attention and returned to the rig for

approximately twelve days of light duty.  (Plaintiff's depo., p. 40).  He went home for his fourteen

days off and during that time never went to see a doctor and was able to do his usual recreational

activities.  (Plaintiff's depo., p. 54, 55).  Once he returned to the rig, he returned to full duty and was

able to perform his job duties as a roustabout for seventeen months, until August 1998 when he went

ashore with a right knee problem.  (Plaintiff's depo., p. 56).  The plaintiff admitted that during the

seventeen months after his initial accident, he never saw the rig medic nor any doctor on shore for

any left knee pain.  (Plaintiff's depo., p. 56, 57).

In August 1998, the plaintiff was ascending a set of stairs when he felt his right knee pop.

(Plaintiff's depo., p. 59, 60).  (Plaintiff had broken his leg and severely injured his right knee in high

school.)  He reported his incident to his crane operator, and was sent ashore for medical treatment.

(Plaintiff's depo., p. 59, 60).  He admitted that there was no accident involved with this right knee

injury.  (Plaintiff's depo., p. 59). The plaintiff underwent an arthroscopic surgery on his right knee

within a week of leaving the rig in August of 1998 and was diagnosed with meniscal tears in his

right knee.  He was treated by Dr. Robert Trettin in Monroe, Louisiana.  Notably, while he told Dr.

Trettin about his 1986 knee injury and broken leg, the plaintiff never told Dr. Trettin that he had

received medical treatment for an alleged left knee injury only seventeen months previously.

In March 1999, two years after the pallet incident, the plaintiff reportedly began developing

pain and swelling in his left knee.  (Plaintiff's depo., p. 65, 66).  There was no precipitating accident

or event.  (Plaintiff's depo., p. 66). He asked to go ashore, and was taken to the doctor.  (Plaintiff's

-5-

depo,. p. 66). Subsequently, a diagnostic arthroscope was performed on the plaintiff's left knee by

Dr. Trettin, and Dr. Trettin shaved some chondromalacia from the plaintiff's patella, and otherwise

diagnosed the plaintiff's left knee ligaments and menisci space as being normal. The plaintiff has

since been released to return to medium/heavy work.

## LEGAL ARGUMENT

The Court must grant summary judgment in favor of the mover when there are no genuine

issues of material fact, and the mover is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986). The mission of summary judgment

is to assess proof in order to see where there is a genuine need for trial. Id. at 1196. The movant

may rely on the complete absence of proof of an essential element of its opponent's claim. Id. at

1195. When after the parties had ample time for discovery in the non-movant's "closet of evidence

is bare," the Court should grant summary judgment in favor of the mover. Id. at 1197.

When the party bearing the burden of proof has presented no evidence to establish one of the

essential elements of his claim, "trial would be a bootless exercise, fated for an inevitable result but

at continued expense for the parties, the preemption of a trial date that might have been used for

other litigants waited impatiently in the judicial queue, and a burden on the Court and the taxpayers."

Id. at 1185. See also, Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The plaintiff as a Jones Act seaman is bound to use ordinary prudence and the exercise of

care for his own safety and likewise, Global Marine is bound to a standard of ordinary care.

-6-

Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir. 1997). The plaintiff, as lead roustabout, was a supervisor aboard the rig and as such had responsibilities for the upkeep and safe condition of the walkways. It was his duty to ensure that the deck was maintained in a safe condition. As such, he cannot recover where his breach of duty constitutes the sole cause of his injury. Peymann v. Perini Corp., 507 F.2d 1318, 1323 (1st Cir. 1974); Rhinehart v. U.S., 457 F.2d 151, 154 (9th Cir. 1972); Foster v. Destin Trading Corp., 700 So.2d 199, 209 (La. 1997), see head notes 12, 16; and Hanks v. Barge Transport Company, Inc., 563 So.2d 1297 (La. App. 3 Cir. 1990).

Plaintiff must establish the essential elements of a negligence action in order to recover under the Jones Act, i.e., the existence of a duty, violation of that duty, and causal relationship between the violation and the injury. Gilmore and Black, 2d Ed., The Law of Admiralty, § 6-36. In the plaintiff's unseaworthiness action, he bears the burden of proving that "the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonable probable consequence of the unseaworthiness." Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1354 (5th Cir. 1998).

The plaintiff cannot recover against Global Marine because Global Marine did not breach any duty owed to the plaintiff. Duty is a question of law. Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289. (La. 1993). The inquiry is whether the plaintiff has any law -- statutory, jurisprudential, or arising from general principles of fault -- to support his claim. Id.

In the instant case, the plaintiff admitted that as lead roustabout it was his responsibility to

-7-

clean his work area, specifically the walkways on the main deck. Next he admitted that he had time

to clean up the buckets and pallets on the walkway between the lifts. (Plaintiff's depo., p. 53, 86).

The plaintiff also testified that the walkway where he tripped was not completely blocked and there

was room to move around within the walkway such that a person could have avoided the objects in

the walkway. (Plaintiff's depo., p. 75). Lastly, he admitted that he was able to see the objects as he

approached them. (Plaintiff's depo., p. 48, 52). The law requires a seaman to look down, see and

objects apparent to anyone. Davilla v. S/S VERCHARMIAN, 247 F. Supp. 617, 620 (E.D. Va.

1965).

In essence, the plaintiff has a duty of maintaining the vessel in a safe and seaworthy condition

and he cannot create or permit a dangerous situation to continue and then prevail with a claim for

an injury which results from the danger he himself created or failed to remedy. Ronquillo v. Belle

Chasse Marine Transportation, Inc., 629 So.2d 1359, 1364-65 (La.App. 4 Cir. 1993). In Foster, the

Louisiana Supreme Court held that the plaintiff was precluded from recovering under the Jones Act

and under the theory of unseaworthiness. 700 So.2d at 199. In this case, the plaintiff, a Captain, was

injured when the wooden plank he used to cross between two barges broke under his weight. Id. at

201. The court found that the defendant did not breach the duty of care owed to its employee

because the plaintiff simply chose to cross in an unsafe manner against company policy. Id. at 209.

Further, the court reasoned that the plaintiff's decision to cross by means of a narrow plank instead

of using an equally convenient permanent walkway was the sole cause of his injuries barring him

-8-

from recovering under a theory of unseaworthiness.

As in <u>Foster</u>, where the court found that the plaintiff's actions were the cause of his injuries barring recovery, this Court should find that the plaintiff's failure to perform his job duties and lack of attention while walking were the cause of his injury. Specifically, the plaintiff admitted it was his job to clean the walkway between lifts and he had time to do so. (Plaintiff's depo., p. 53, 86). Further, he testified that he could see the buckets and pallets as he approached them and he had ample room to avoid them but simply did not. (Plaintiff's depo., p. 52, 75, 76).

Plaintiff's injury to his right knee ascending a flight of stairs and the soreness of his left knee, were things that plaintiff admitted in his own words, occurred with no accident involved. As a result, Global Marine has no liability for these injuries.

## CONCLUSION

As shown above, plaintiff cannot establish the essential elements to recover under the Jones Act or unseaworthiness against Global Marine. Neither the law nor the facts show that Global Marine has breached any duty owed to the plaintiff, nor has any evidence been adduced that the ADRIATIC VII was unseaworthy. The plaintiff's failure to clean up the walkway and/or not walk around the buckets and pallets were the sole cause of his injury to his left knee. In short, through his own negligence, plaintiff tripped over a bucket or pallet that by his own admission he had time to pick up. But for his neglect to perform his duties in a seamanlike manner, the accident would not have occurred. <u>Goodrich v. Cargo Ships and Tankers, Inc.</u>, 241 F.Supp. 332 (E.D. La. 1965).

-9-

Because the plaintiff cannot carry his burden of proof, under Federal Rule of Civil Procedure 56, defendant, Global Marine, is entitled to summary judgment as a matter of law. Accordingly, defendant requests the Court to dismiss the plaintiff's action against Global Marine Drilling Company.

Consequently, Global Marine has not breached any duty owed to the plaintiff and the plaintiff's negligence and breach of his responsibilities were the sole cause of this accident.

Respectfully submitted,

DELOS E. FLINT, JR., T.A. (#5616)
ROBERT R. JOHNSTON (#22442)
DANIEL LICHTL (#26385)
FOWLER, RODRIGUEZ, KINGSMILL,
   FLINT & GRAY, L.L.P.
201 St. Charles Avenue, 36th Floor
New Orleans, Louisiana 70170
Telephone: (504) 523-2600
Attorneys for Defendant,
Global Marine Drilling Company

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon counsel for all parties by depositing a copy of same via hand delivery on this _27_ day of December, 2000.

-10-

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF LOUISIANA

3

4    CIVIL ACTION                    MAGISTRATE:   5
     NO.   00-0293                   SECTION "J" (1)
5    * * * * * * * * * * * * * * * * * * * * * * * *

6                   TRAVIS D. BARTON

7                        VERSUS

8        GLOBAL MARINE DRILLING COMPANY

9    * * * * * * * * * * * * * * * * * * * * * * * *

10

11

12

13        Deposition of **TRAVIS D. BARTON**, taken in

14    the above-titled cause, before Carol S. Wentz,

15    Certified Court Reporter, at the offices of

16    Davis, Saunders, Arata & Rome, 3113 Sixteenth

17    Street, Metairie, Louisiana 70011, on

18    September 27, 2000.

19

20

21

22                              ORIGINAL

23

24

25

2

1 | APPEARANCES:

2

3 | REPRESENTING THE PLAINTIFF:

4 | Benjamin B. Saunders, Esquire
DAVIS, SAUNDERS, ARATA & ROME
5 | 3113 Sixteenth Street
Metairie, Louisiana 70011
6

7 | Samuel T. Singer, Esquire
6603 Main Street
8 | Winnsboro, Louisiana 71295

9

10 | REPRESENTING THE DEFENDANT:

11 | Robert Johnston, Esquire
RICE, FOWLER, RODRIGUEZ,
12 | KINGSMILL & FLINT
201 St. Charles Avenue, 36th Floor
13 | New Orleans, Louisiana 70170

14

15 | ALSO PRESENT:

16 | Amaree Barton

17

18 | REPORTED BY:

19 | Carol S. Wentz
Certified Court Reporter
20 | Registered Professional Reporter

21

22

23

24

25

3

<pre>
 1              S T I P U L A T I O N

 2         It is stipulated and agreed to, by and

 3  between counsel, that the Deposition of

 4  TRAVIS D. BARTON is hereby being taken pursuant

 5  to Notice, for all purposes, under the Federal

 6  Rules of Civil Procedure;

 7         That the formalities of reading and

 8  signing are reserved;

 9         That the formalities of sealing,

10  certification and filing are waived;

11         That all objections, except those as to

12  the form of the question and/or the

13  responsiveness of the answer are reserved until

14  the time as this deposition, or any part thereof,

15  may be used or sought to be used in evidence.

16               *   *   *   *

17         That Carol S. Wentz, Certified

18  Court Reporter, in and for the State of

19  Louisiana, officiated in administering the oath

20  to the witness.

21

22

23

24

25
</pre>

36

1    your crew was?

2        A.    Yes, sir.   That's the two names I had

3    given you, that and the crane operator.

4        Q.    The crane operator was Craig Sahahn?

5        A.    Sahahn.

6        Q.    Tell me what happened at the time of

7    your accident.

8        A.    Well, we were running casing.   We had

9    had a boat tied up that day.   We had unloaded

10   casing.   It had been storming during the day,

11   raining.   We were trying to clean the floors, get

12   stuff ready to go so we could put the casing in

13   the hole.

14           Toward the end of my tour, which was

15   actually almost time to change tours, the crane

16   operator was paying attention to the boat because

17   we had fairly rough seas.   The rope broke.   He

18   called for help.

19           I was on the upper pipe rack.   I had to

20   come down the stairs, step on the I-beam, and

21   then step on the floor to go get the stinger to

22   set it down to the boat to get the other rope off

23   so the boat could maneuver away from the rig.

24           In the process from leaving the I-beam

25   down to the floor, some debris and stuff was on

1  the main deck.  I tripped and fell on a padeye,

2  striking my left knee.

3      Q.   I am going to break this down, and we

4  will go through it again.

5          What do you recall hitting your left

6  knee on?

7      A.   A padeye.

8      Q.   What part of your knee?

9      A.   The very top, right on top of the

10  kneecap.

11      Q.   It hit you straight on, on your kneecap?

12      A.   Straight on my knee.

13      Q.   Straight on the kneecap?

14      A.   Yes, sir.

15      Q.   What happened then?

16      A.   Mr. Burt Jones was there.  He helped me

17  get up off the floor.  Some other crew members

18  had already went up the stairs to get hold of the

19  stinger to let it down to the boat.

20          He helped me inside.  The crane operator

21  had come in and looked at the knee.  He woke up

22  the rig --

23      Q.   Medic?

24      A.   -- medic.  The rig medic had come in and

25  looked at it and put ice on it.

1     Q.    Thomas Montgomery?

2     A.    Thomas Montgomery.

3     Q.    What did Dr. Montgomery say?

4     A.    He said -- I'm not for sure what all he

5  said.  He told me, as far as he was concerned,

6  there was nothing that was -- there should have

7  been no permanent damage, as far as he could

8  tell.  He sent me back to the rig on light duty.

9     Q.    Did you disagree with anything that he

10 was saying?

11    A.    I'm not a doctor.

12    Q.    Did you disagree with going back to the

13 rig?

14    A.    No, sir.

15    Q.    When you came back out to the rig, do

16 you recall how many days were left in your hitch?

17    A.    Twelve.

18    Q.    Let me just make sure I have our timing

19 down.  You told me earlier that your accident

20 happened on the second or third day that you were

21 out there?

22    A.    Probably the second day.  They sent me

23 in on the third.  Then I had come back out on the

24 fourth, so I would have 11 days left.

25    Q.    You were working 14-day hitches?

42

1      Q.   It was dark, right?

2      A.   Yes, sir.

3      A.   It was night time but it wasn't --

4      A.   It was night time and cloudy.

5      Q.   You were standing on the upper pipe

6   rack?

7      A.   Yes, sir.

8      Q.   What were you doing up there?

9      A.   I was getting ready to run casing.

10     Q.   What does that involve?

11     A.   Setting up your cat walk so you can --

12  so the crane operator can send casing down and

13  they can pull it up in the hole.

14     Q.   Okay.

15     A.   It is hard to -- you kind of have to see

16  it.

17     Q.   I will do my best, but I will probably

18  ask you some stupid questions in the process.

19     A.   Okay.

20     Q.   Had the casing you were going to be

21  working with had already been --

22     A.   They had just finished the prior evening

23  or that morning when we had come on tour

24  unloading.  We had finished unloading the boat

25  and were trying, in the process, to getting

1    cleaned up.

2          Casing has a lot of grease that goes

3    with it.  We were trying to get stuff up and

4    ready to run.

5          Q.   So the boat had been unloaded?

6          A.   Most of it.  It still had pallets of

7    chemicals on the boat.

8          Q.   So just the casing had been unloaded?

9          A.   Just the casing had been unloaded.

10         Q.   Your job overall was that you guys would

11    start rigging things up so that you could then

12    take the casing off the pipe rack and it could

13    start going in the hole?

14         A.   Yes, sir.

15         Q.   Once that operation began, were you

16    going to be hooking up slings and things like

17    that?

18         A.   I would be hooking up slings, putting

19    the rubber ends on the casing, whatever.

20    Sometimes I'm allowed to run the crane during the

21    casing jobs.

22         Q.   When you talk about cleaning things up

23    so you could get started working, what exactly

24    were you cleaning up?

25         A.   Well, if you are unloading casing,

44

1    casing comes out with a lot of grease and dope on

2    the threads, that kind of stuff.

3         At the time, the rig we were on, you had

4    to transfer the casing from the boat to the main

5    deck and then from the main deck to the upper

6    pipe deck because the main crane won't reach all

7    of the way forward to the main deck.

8    Q.   Was the casing leaking grease or

9    anything like that?

10   A.   It is nasty.  Casing is just nasty in

11   general.  I have never seen clean casing.

12   Q.   Was this a job, generally, working in

13   this upper pipe area to get the casing ready to

14   go in the hole --

15   A.   It was --

16   Q.   Let me finish.  Was that job one you

17   were familiar with?

18   A.   Yes, sir.

19   Q.   You had done it before?

20   A.   Yes, sir.

21   Q.   Was part of your job to make sure that

22   the walkway stayed safe and clear up there?

23   A.   As clear as possible and still keep the

24   casing going.

25   Q.   And were you on this upper pipe rack

48

1          After you traveled down the flight of

2    stairs and you reached the main deck area, how

3    far did you go before you tripped on the padeye?

4          A.    Probably 10, maybe 12 feet.

5          Q.    What was the lighting like in the area?

6          A.    Pretty poor.

7          Q.    Was there any particular reason?

8          A.    Basically, probably because it was

9    cloudy.

10         Q.    Is there artificial lighting on the rig?

11         A.    Artificial lighting on the rig.

12         Q.    Were all of the light bulbs working, as

13   far as you know?

14         A.    As far as I know.

15         Q.    On the main deck, was there anything in

16   the walkway or anything like that?

17         A.    We had pallets and soap buckets where we

18   had been cleaning the rig up.

19         Q.    What were you cleaning?

20         A.    The main deck, trying to clean up the

21   mess that the crew previously had made unloading

22   the casing.

23         Q.    Had you been down there on the main deck

24   helping with the cleanup?

25         A.    Yes, sir, I had.

50

1    that is like a fixed thing --

2         A.   I didn't trip on the padeye.

3         Q.   That's what you hit your knee on?

4         A.   That's what I hit my knee on.

5         Q.   Thank you for correcting me.

6              What did you trip on?

7         A.   Some debris on the main deck.

8         Q.   Would that be the pallets and soap

9    buckets?

10        A.   Pallets and soap that was on the deck.

11        Q.   What were the pallets doing there?

12        A.   We had -- They had just emptied and

13   cleaned out our material room.  We were bringing

14   those pallets out to send those pallets to a boat

15   so we could get them off of the rig.

16        Q.   So it was your crew who had brought the

17   pallets out into that area?

18        A.   No, sir, it was not my crew.  It was the

19   crew before that had cleared out the storeroom so

20   that, once they got the casing off, that if they

21   had time, to put the other -- either the pallets

22   on the boat or bring the chemicals on the boat

23   off and put them down and send all the empty

24   pallets back to the boat.

25        Q.   And what exactly was it that you tripped

52

1  you fall?

2      A.   I'm pretty sure Mr. Burt did.  I do not

3  know about Mr. Doucet.

4      Q.   I know I just asked you this, but let me

5  ask it a little more clearly.

6          As you were coming along the walkway and

7  you were proceeding toward the area where the

8  debris was, were you able to see the debris as

9  you were approaching it?

10     A.   Probably so.

11     Q.   The fact that the padeye was not

12  something you could see beforehand -- How do I

13  put this?

14         Did that make a big difference because

15  you had already tripped when you hit the padeye,

16  right?

17     A.   I had already tripped when I hit the

18  padeye.

19     Q.   Once you tripped, you had no say-so on

20  where you came to land?

21     A.   No, sir.

22     Q.   Now, was anybody or had anybody been

23  assigned to clear out this walkway prior to the

24  time your accident occurred?

25     A.   That, I do not know.  It is just

53

1   standard rules that you try to clean up.

2        Q.    Generally speaking, who are the people

3   who are responsible for keeping the walkways

4   clear?

5        A.    Roustabouts.

6        Q.    You had been on tour for about 11 hours

7   or so --

8        A.    Yes, sir.

9        Q.    -- at the time of your accident?

10       A.    Yes, sir.

11       Q.    Now, do you know if anybody got written

12  up as a result of this accident?

13       A.    I do not know.

14       Q.    So let me get a little better picture of

15  what happened after you came back.

16            After you saw the doctors in Lafayette,

17  you came back and did light duty --

18       A.    Yes, sir.

19       Q.    -- you told me for about 12 days?

20       A.    Yes, sir.

21       Q.    You went home and then had your regular

22  14 off?

23       A.    Regular 14 off.

24       Q.    Did you ride with anybody from the crew

25  change?

54

```
 1        A.    Yes, sir, I did.

 2        Q.    Who is that?

 3        A.    Mr. Burt Jones.

 4        Q.    How long a ride was it home?

 5        A.    About three and a half hours.

 6        Q.    Had you and he spoken since you left

 7   Global?

 8        A.    Good friends.

 9        Q.    He is a good friend of yours?

10        A.    Yes, sir.

11        Q.    So you have spoken?

12        A.    Yes, sir.

13        Q.    Is he still working for Global?

14        A.    I don't know.  The last time I probably

15   spoke to him has been about a year or so.  The

16   last time I spoke to him he was working.  Whether

17   he is now or not, I do not know.

18        Q.    Did you go see a doctor on your 14 off?

19        A.    Dr. Montgomery told me, if I felt fine,

20   not to worry about it and, if I started hurting,

21   come back and see him.

22        Q.    How were you feeling on your 14 days

23   off?

24        A.    I was feeling all right.  There wasn't

25   nothing broke so no need to fix it.
```

755 MAGAZINE STREET, SUITE 200           AFFILIATED REPORTING TECHNOLOGY, INC.          Ph (504) 523-3747
NEW ORLEANS, LOUISIANA 70130                   OFFICIAL COURT REPORTERS                 Fax (504) 522-4777

55

1    Q.    Were you able to do what you ordinarily

2  would have done on your 14 days off?

3    A.    I guess so.  I fish when I am off, or

4  hunt.  At the time, it wasn't hunting season, so

5  I mainly fished around.  I didn't go play

6  football or basketball, but I had done pretty

7  much what I normally do.

8    Q.    When it came time for you to go back to

9  the rig 14 days after you had gotten off of it,

10  did you feel like you could go back and do your

11  regular duties?

12    A.    I felt like I was.

13    Q.    Did you, in fact, return then at full

14  duty?

15    A.    Full duty.

16    Q.    That would still have been, it looks

17  like, in March of '97?

18    A.    Yes, sir.

19    Q.    When you got back out to the rig, were

20  you able to successfully do your full duty job?

21    A.    I did my full duty.  I was sore, but I

22  had done my job.

23    Q.    Did you ever see the medic while you

24  were out on the rig --

25    A.    No, sir.

56

1      Q.    -- that next hitch?

2      A.    (Witness shaking head negatively.)

3      Q.    I'm looking at just some notes that I

4  have about when you went in with your right knee

5  problem.  Okay?

6      A.    Yes, sir.

7      Q.    What I have seen shows you injured your

8  left knee in March of '97, and then you went

9  ashore for your right knee in August of '98.  So

10 that's 17 months.  Okay?

11     A.    Yes, sir.

12     Q.    Within that 17-month period, from March

13 of '97 until August of '98, with the exception of

14 when you were on light duty, were you able to do

15 your regular duties as a roustabout?

16     A.    Yes, sir, I was.

17     Q.    That would have included, as you told

18 me, one 28-day hitch when you transferred rigs;

19 is that right?

20     A.    Yes, sir.

21     Q.    Once you had come back to the rig, the

22 hitch after your accident, did you ever see the

23 medic for your left knee in that period of time

24 before August of '98?

25     A.    I do not believe so.

1      Q.    Did you ever see any doctors on shore

2  during your time off?

3      A.    I don't think so.

4      Q.    Did you have any problems with your left

5  knee during that 17-month period of time?

6      A.    Aches and pains.

7      Q.    Can you describe them for me?

8      A.    At the end of the day, tired, the knee

9  would be swollen, sore.

10     Q.    Your knee would swell?

11     A.    Yes, sir.

12     Q.    How often would that happen?

13     A.    It depends on how much I had to climb in

14  and out of tanks or up and down stairs.  Some

15  days were better than others.

16     Q.    But you are telling me that you were

17  always able to get up the next day --

18     A.    Yes, sir.

19     Q.    -- and do your regular duties?

20     A.    Yes, sir.

21     Q.    Do you recall or are you able to give us

22  any estimate of how many times you observed your

23  knee swell up during that period of time?

24     A.    At least five to six times a hitch.

25     Q.    How much swelling are we talking

59

1    A.    No, sir.

2    Q.    So in August of '98, you developed

3    enough of a problem with your right knee that you

4    couldn't work, right?

5    A.    I wanted to have it checked.    I was

6    having trouble.

7    Q.    How long had it been bothering you when

8    that happened?

9    A.    Probably around six months.

10    Q.    Tell me in as much detail as you can

11    exactly what happened that led to you wanting to

12    go in.

13    A.    I guess as far as to my right knee, I

14    had some bad hitches and my leg was getting sore,

15    and it was getting tough to go up and down stairs

16    without help of handrails, which you are supposed

17    to use.

18         But the night that I decided to go in, I

19    started up a set of stairs and my knee popped.    I

20    had to sit down.    I almost fell.    I didn't know

21    what was wrong.    It was not, per se, an accident

22    that caused it, you know.

23         I went and talked to my crane operator

24    and went and talked to my toolpusher and was

25    allowed to go in to see a doctor.

1    Q.   Had your right knee popped before this

2  time?

3    A.   No, sir.  I hadn't had any trouble up to

4  this point.

5    Q.   Was your left knee popping at all?

6    A.   Some.  I don't know if it ever truly got

7  well.

8    Q.   I'm asking specifically about a feeling

9  of popping.

10   A.   No, sir, it had not.

11   Q.   It had not been popping?

12   A.   My left knee had not been popping.

13   Q.   Let me back up.  You are walking up the

14 stairs and your knee pops.

15         Did you go immediately to your

16 toolpusher?

17   A.   I went immediately to my crane operator.

18   Q.   Who is that?

19   A.   I'm trying to remember.

20   Q.   You were on the Highland VIII then?

21   A.   I was on the Highland VIII.  I can't

22 recall his name at this second.

23   Q.   Do you recall who your roustabout crew

24 was?

25   A.   I had -- it is so hard because we

65

1      A.    I believe so, yes, sir.

2      Q.    And when you got back out, were you

3  working with the same roustabout crew?

4      A.    Same crew.

5      Q.    Same crane operator?

6      A.    Yes, sir.

7      Q.    How long did you work before you went in

8  for good?

9      A.    I believe three or four hitches.

10     Q.    During those three or four hitches, did

11 you have any problems with your knees?

12     A.    My right one, I didn't.  My left one, I

13 did.

14     Q.    Did you see the medic at all for your

15 knee?

16     A.    It was swelling.  I had seen him for the

17 swelling.  He would give me ice at night.  Other

18 than that, there is nothing he can do.  He is not

19 a doctor, I do believe.

20     Q.    During this period of time when you had

21 returned to work following your right knee

22 surgery, were you seeing any doctors during your

23 time off?

24     A.    No, sir, I wasn't.

25     Q.    What then happened that led you to leave

66

1  the rig?

2     A.   My left knee started with that same

3  problem as the right.  It had gotten to where I

4  could hardly walk up and down stairs.

5          The swelling was causing my blue jeans

6  to get tight.  It was getting to where I could

7  hardly bend it.  It got to the point where it was

8  hurting more than it was worth staying out there.

9     Q.   Tell me exactly, in as much detail as

10  you can, how you ended up going in.

11     A.   Basically, the same way I did with my

12  right.  When I asked to go in, I had no accident.

13  It just got to where the pain was more than what

14  I wanted to take on a day-in, day-out basis on a

15  rig, up and down stairs everyday.

16          I went to my crane operator and told him

17  I was having trouble.  We went to the barge

18  master and the toolpusher and asked him to be

19  allowed to go in to see a doctor about my left

20  one.

21     Q.   And they let you go in?

22     A.   They let me go in.

23     Q.   What I have got here is that that took

24  place on March 22 of '99.  Does that sound like a

25  reasonable date to you?

75

1  going down?

2      A.   From here about two foot, maybe two and

3  a half, three.   (Indicating.)

4      Q.   That's the walkway that you told us

5  there was some debris on?

6      A.   Right.   That's the only walkway you

7  have.   You can't walk on this side of the I-beam

8  because it is pipe racks and usually full of

9  drill pipes and casing or whatever at the time we

10 have on the rig.

11     Q.   How much of the walkway had debris

12 across it?

13     A.   A good bit because, like I said, we had

14 been cleaning.   We were moving stuff around and

15 trying to get stuff straighten up and cleaned up.

16     Q.   Okay.

17     A.   In between all of that, we are trying to

18 take casing from the lower pipe rack to the upper

19 pipe rack to get ready to run.

20     Q.   And was the walkway completely blocked

21 by anything?

22     A.   It wasn't completely blocked.   There was

23 room to move around, not a lot, but there was

24 stuff in the walkway.   We had soap buckets and

25 that kind of stuff.

1      Q.   But it was something you could have

2  walked by?

3      A.   You could have got around.

4      Q.   At the time of your accident in '97,

5  were you the assistant crane operator?

6      A.   At the time, no, sir, I was not.

7      Q.   Who was the lead roustabout?

8      A.   I was probably lead roustabout but that

9  was before they had come up with -- that was the

10  next step to --

11      Q.   Assistant crane operator?

12      A.   Right.

13      Q.   But as far as you know, you were the

14  lead roustabout?

15      A.   As far as I know.

16      Q.   Was there an assistant crane operator on

17  the whole crew?

18      A.   On our crew, we didn't have one.

19      Q.   So you were the next guy below the crane

20  operator?

21      A.   Yes, sir.

22      Q.   Did the weather conditions play a role

23  in your accident, as far as you know?

24      A.   I don't think so.  I have worked in

25  worse weather.

1    Q.   And tell me what happened when you went

2    from initially cleaning when you started your

3    tour to starting to move the pipe from the main

4    pipe rack to the upper pipe deck.

5         What happened?

6    A.   Just the crane operator called and got

7    everybody together and talked about what we were

8    fixing to do.  He said we were to set everything

9    aside for that moment, get all of the pipe up on

10   the top rack to get ready to run.

11   Q.   How long did it take to transfer the

12   pipe from the main deck to the upper pipe rack?

13   A.   Probably, six hours.

14   Q.   How many mop buckets and pallets were

15   there in that walkway?

16   A.   For sure, two mop buckets, and I

17   couldn't give you a number on pallets.  It

18   probably wasn't no more than ten.

19   Q.   Did they have anything on them?

20   A.   No.  They were empty pallets stacked on

21   top of one another.  Some were loose.

22   Q.   Did you, at any time, request to be

23   allowed to move that stuff out of the walkway --

24   A.   I tried to pick up and clean up when I

25   wasn't hooking up on pipe.  That is a mandatory

83

1  job.   If I'm not busy with something, I stop and

2  clean.

3       Q.   But --

4       A.   Like I said, the whole rig was dirty.

5  We had grease everywhere from moving the casing

6  off the boat to the rig and then from the bottom

7  of the rig to the top.

8       Q.   The grease and stuff that was on the

9  pipe, did that have anything to do with your

10 accident?

11      A.   Sure.   You get it all over you.   It gets

12 on the decks.   It gets on your gloves, boots.   It

13 is a nasty job.

14      Q.   How was that involved in you tripping?

15      A.   There was grease on the deck.   We had

16 not had time to get the decks cleaned up and

17 grease off of them.

18      Q.   Did you trip or slip?

19      A.   Well, I tripped, but with the grease and

20 everything on the floor, because I had come off

21 the pipe rack and had been walking around the

22 bottom of the deck with the pipe and stuff, you

23 know, maybe it could have been some of both.

24      Q.   You had been doing some cleaning on the

25 upper pipe rack?

1   done.

2       A.   You would be picking up, trying to get

3   grease off the floor and any foreign objects or

4   materials.

5       Q.   When you guys were moving the pipe from

6   the main deck up to the upper pipe rack, did you

7   stay on the main deck the whole time, or were you

8   going up and down?

9       A.   If I was needed to go up, I would go up

10  and help.  If not, I stayed on the main deck.

11      Q.   Do you recall which you did more of?

12      A.   More on the main deck.

13      Q.   How much time would you have between

14  hooking up a load of casing to when you were

15  needed again if you stayed on the main deck the

16  whole time?

17      A.   Probably no more than ten minutes.

18      Q.   And from the time that you finished

19  hooking up and the crane operator lifted it --

20      A.   Right.

21      Q.   -- am I correct that that was when you

22  would do your cleaning up?

23      A.   Yes, sir.

24      Q.   And you had been on that area,

25  understanding that some of the time you were on

1  the upper pipe rack, for about six hours until

2  all of the pipe had been lifted?

3      A.   Yes, sir.

4      Q.   How far away was the debris in the

5  walkway from where you were standing to rig up

6  the pipe to be moved?

7      A.   Probably anywhere from 20, 25 foot.

8      Q.   So would you have had time in between

9  loads to have gone onto the walkway and have

10 moved some of that stuff out of the way?

11     A.   Probably so.

12     Q.   And were all three of you guys working

13 on the main deck, or was somebody up on the main

14 pipe rack?

15     A.   Just by myself on the main deck.

16     Q.   So you were the guy doing the hook-ups?

17     A.   Yes, sir.

18     Q.   One guy can do that?

19     A.   One guy can.

20     Q.   So you played football in high school?

21     A.   Yes, sir.

22     Q.   What position?

23     A.   Whatever they needed.  Did you play one

24 more than the others?

25     A.   Middle linebacker mostly.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TRAVIS D. BARTON**<br>　　**Plaintiff** | * | **CIVIL ACTION** |
| | * | **NO. 00-0293** |
| **VERSUS** | | |
| | * | **SECTION "J"** |
| **GLOBAL MARINE DRILLING COMPANY**<br>　　**Defendant** | | **JUDGE BARBIER** |
| | * | **MAGISTRATE: 5 (CHASEZ)** |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

## GLOBAL MARINE DRILLING COMPANY'S
## STATEMENT OF UNCONTESTED MATERIAL FACTS

NOW INTO COURT, through undersigned counsel comes defendant, Global Marine Drilling Company ("Global Marine"), which respectfully submits the following Statement of Uncontested Material Facts in support of its Motion for Summary Judgment:

1.　　On March 8, 1997, Travis D. Barton was an employee of Global Marine Drilling Company and served as lead roustabout aboard the ADRIATIC VII.

2.　　As lead roustabout, Travis Barton's responsibility was to keep a walkway clear.

3.　　Travis Barton's accident on March 8, 1997 occurred near the end of the plaintiff's twelve hour tour.

4.　　Travis Barton was familiar with the area where he was working, specifically the walkway.

5.    The objects in the walkway consisted of two mop buckets and fewer than ten pallets.

6.    The walkway was approximately twenty to twenty-five feet away from the plaintiff when he was working on the casing.

7.    The plaintiff had ample time between hooking up loads of casing to walk over to the walkway and move the buckets and pallets out of the way. (Plaintiff's depo., p.86)

8.    The walkway was not completely blocked and there was sufficient room to move around within the walkway. (Plaintiff's depo., p. 76).

9.    One could have walked around the objects in the walkway without hitting them. (Plaintiff's depo., p. 75).

10.   Travis Barton was able to see the objects as he approached them.

11.   After his accident, the plaintiff returned to the rig to full duty and was able to perform his job duties as a roustabout for seventeen months, until August 1998 when he went ashore with a right knee problem.

12.   The plaintiff, during these seventeen months after his March 8, 1997 incident, never saw the rig medic nor a doctor at any time for left knee pain.

13.   In August 1998, the plaintiff was ascending a set of stairs when he felt his right knee pop.

14.   With respect to this August 1998 incident, there was no accident involved with Travis Barton's right knee injury.

15.   In March 1999, the plaintiff left the HIGH ISLAND VIII because of pain and swelling in his left knee.

16.   This March 1999 incident had no precipitating accident or event which caused the plaintiff's injuries.

Respectfully submitted,

DELOS E. FLINT, JR., T.A. (#5616)
ROBERT R. JOHNSTON (#22442)
DANIEL LICHTL (#26385)
FOWLER, RODRIGUEZ
201 St. Charles Avenue, 36th Floor
New Orleans, Louisiana 70170
Telephone: (504) 523-2600
Attorneys for Defendant,
Global Marine Drilling Company

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 22 day
of December, 20 01 served a copy of the
foregoing pleading on counsel for all parties to
the proceeding, by hand delivery and properly
addressed.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TRAVIS D. BARTON** | * | **CIVIL ACTION** |
| **Plaintiff** | | |
| | * | **NO. 00-0293** |
| **VERSUS** | | |
| | * | **SECTION "J"** |
| **GLOBAL MARINE DRILLING COMPANY** | | **JUDGE BARBIER** |
| **Defendant** | * | **MAGISTRATE: 5 (CHASEZ)** |

\*     \*     \*     \*     \*     \*     \*     \*

## NOTICE OF HEARING

TO:   TRAVIS D. BARTON
        through his attorneys of record;
        Benjamin Saunders
        Davis & Saunders, PLC
        3113 Sixteenth Street
        Post Office Box 8801
        Metairie, LA  70011-8801

PLEASE TAKE NOTICE that counsel for defendant, Global Marine Drilling Company,

will bring on for hearing a Motion for Summary Judgment on January 17, 2001, at 9:30 a.m.,

before the Honorable Carl J. Barbier, United States District Court for the Eastern District of

Louisiana.

New Orleans, Louisiana, this ____ day of _____, 200__.


_____
JUDGE