

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

TRAVIS D. BARTON           *
    Plaintiff              *
                           *         CIVIL ACTION
VERSUS                     *
                           *         NO. 00-0293
GLOBAL MARINE DRILLING COMPANY *
    Defendant              *         SECTION "J"
                           *
                           *         MAGISTRATE: 5
                           *

\* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN OPPOSITION TO**
**MOTION FOR SUMMARY JUDGEMENT FILED BY DEFENDANT**

**MAY IT PLEASE THE COURT:**

The plaintiff, Travis D. Barton, was injured on March 8, 1997 on the M/V ADRIATIC VII. At the time of his injury, plaintiff was working as a roustabout for defendant, Global Marine Drilling Company (Global Marine). Plaintiff injured his left knee after tripping over debris on the main deck and striking his knee on an unmarked pad eye. As may be seen by the attached Affidavit, plaintiff's fellow workman, Bert Jones, was an eyewitness to plaintiff's accident (See, Bert Jones Affidavit, paragraph no. 7; Barton deposition p. 36-37). Prior to plaintiff's accident, he was loading casing that had been dumped on the deck by the prior crew together with pallets and chemicals in the walkway, (as may be seen by reference of the Affidavit of Bert Jones as well as plaintiff's own deposition at p. 42).

There was not sufficient time to clean or clear the walkway and remove the debris left by the prior shift as Mr. Barton's crew

was instructed to put everything on hold so the pipe could be moved. (See, Bert Jones Affidavit, No. 17).

During this process, suddenly and without warning, an emergency situation arose in which one of the M/V Adriatic VII's mooring lines attached to the supply vessel, snapped resulting in the crane operator ordering everyone to scene where the line had broken.

Therefore, at the time plaintiff was injured, he was rushing to secure a mooring line that had broken due to either rough seas or because it was defective (See, Sehon deposition, p 23, 34). These unseaworthy conditions on the M/V Adriatic VII on the evening of plaintiff's accident consisted of an obstructed walkway creating a dangerous condition or "tripping hazzard" for a seaman to navigate around on a rig especially in an emergency situation.

Given these sworn facts, not only from plaintiff, but from his plaintiff operator and his fellow crew member, Bert Jones per Affidavit, it is obvious defendant's Motion for Summary Judgement should be DENIED as a matter of law and the case should proceed to trial on the merits.

As authority plaintiff cites this court to <u>Yballa v. Sea-Land Services, Inc.</u>, U.S.D.C. D. Hawai'i (U.S.D.C. 1995). In <u>Yballa</u>, the court specifically recognizes that it must exercise special care in considering a summary judgment in a Jones Act case, which by its nature requires a very low evidentiary threshold for submission to a jury.

In the instant case, plaintiff, Travis D. Barton, has iron-clad facts which directly prove negligence constituting callous disregard for safety by his employer, Global Marine, as elicited item by item below with appropriate substantiation.

## FACTS

Plaintiff, Travis Barton, was a roustabout employed by Global Marine. He was injured at approximately 11:30 p.m. on the evening of March 8, 1997 (See, Sehon deposition, p 18). The injury occurred as plaintiff was rushing to secure a mooring line which had broken. The injury occurred near the end of plaintiff's shift (Barton deposition, p. 53). The crew before plaintiff's shift was unloading casing and had left grease as well as other debris in the walkway (Barton deposition, p 43). One of the routstabouts' duties was to clean up such debris, however, the roustabouts were unable to do so as they were instructed to "put everything else aside" as the casing was being moved from the main deck to the upper pipe rack (Bert Jones Affidavit, No. 17). The casing had been unloaded by the opposite roustabout crew before plaintiff's crew had come on tour and had left grease as well as other debris (pallet, mop buckets) in the walkway (See, Barton deposition, p 50). Plaintiff, as well as the other roustabouts, tried to clean up as best they could, however, there simply was not enough time to do an adequate job of cleaning (See, Bert Jones Affidavit, No.. 14). Just prior to plaintiff's accident, a mooring line connected to the work boat broke creating an emergency situation (See, Jones Affidavit, No. 14). The crane operator called for help over the public address

system and plaintiff went down the stairs to the main deck to get a stringer, a piece of wire used to lower another mooring line to the rig (Barton depo., p 36). As plaintiff was walking along the walkway on the main deck to retrieve the stringer, plaintiff tripped over debris left in the walkway and fell, striking the top part of his left knee on an unmarked pad eye used to secure the cantilever (Barton depo., p 36, 48).

## LAW

Federal Rule of Civil Procedure 56 permits the court to grant a summary judgment, even in a Jones Act case, if there is no genuine issue of material fact and the mover is entitled to judgment as a matter of law. This is not the situated presented in the instant case; thus, defendant's Motion for Summary Judgment must be DENIED.

The court cannot grant summary judgment in favor of the movant when there are genuine issues of material fact, and there is a genuine need for trial on the issues presented. Courts should exercise special care in considering summary judgment in Jones Act cases which require a very low threshold for submission to the jury, Yballa v. Sea-Land Services, 937 F. Supp. 1428.

The vessel owner's duty to prevent unseaworthy conditions is absolute, continuing, and non-delegable and lack of knowledge or of opportunity to correct such conditions does not mitigate the owner's duty. The debris in the walkway and slippery walkway present on the M/V Adriatic VII on the night of March 8, 1997 constituted a breach of the duty of seaworthiness which Global

Marine and owed to its employees. <u>Davis v. Hill Engineering, Inc.</u>, 549 F.2d 314 (1977), Rehearing denied 554 F.2d 1065;

Specifically, in <u>Davis</u>, <u>supra</u>, the court held that evidence unsafe conditions existed on deck of barge through accumulation of oil, grease and water on metal deck and that seaman's employer, the charterer of the vessel, did nothing to inspect the vessel or take precautions in order to provide its employees with a safe working place, the district court could reasonably find liability under the Jones Act.

Further, in <u>Kratzer v. Capital Marine Supply, Inc.</u>, M.D. La. 1980, 490 F.Supp. 222, affirmed 645 F.2d 477, the United States District Court, for the Middle District of Louisiana, held an employer liable under the Jones Act for negligence if he fails to provide his employed seaman with a reasonably safe place within which to work. The court even went on to hold that evidence of the slightest negligence is sufficient to sustain a finding of liability under the Jones Act and that a seamen's duty to protect himself is slight as his duty is to do the work assigned, and not find the safest method of work.

This court's attention is also directed to <u>Puamier v. Barge BT</u>, 1793, E.D. Va. 1974, 395 F.Supp. 1019 in which the United States District Court for the Eastern District of Virginia was presented with a situation analogous to that presented in the instant case. Specifically, the right of seaman to recover under the Jones Act for the negligent actions of fellow crew members was recognized. In <u>Barton</u>, it must be remembered, plaintiff did not

make the mess, he only had to navigate through it on orders in an emergency.

Finally, this Court's attention is addressed to the sister cases of <u>Hudson Waterways Corp v. Coastal Marine Services, Inc.</u>, E.D.Tex. 1977, 436 F.Supp. 597 and <u>Sterling v. New England Fish Co</u>, W.D. Wash. 1976, 410 F.Supp. 164 in which both of these geographically diverse district courts recognized the liability of a Jones Act employer in failing to provide a safe means of a seaman to get from ship to shore which even more stringent in this case as Mr. Barton was not provided with a safe means to get from one spot on the rig that he was ordered to work to another where he was ordered to go in an emergency.

## **CONCLUSION**

Tripping and slipping hazards in the walkway constitute neglect under the Jones Act and cases have repeatedly held Jones Act employers liable for unseaworthy conditions.

Exacerbating the situation in this case was that an emergency situation occurred when a mooring line broke forcing roustabouts to rush (not run) and abandon the rush job they were doing in loading the pipe at the time the line broke. Thus, Global Marine is liable on not one, but several counts of neglect of the worst sort.

Accordingly, defendant's Motion for Summary Judgment should be DENIED as there exist genuine issues of material fact as to the condition of the walkway at the time of the incident. Mr. Sehon claims the walkway was clear, Mr. Jones and Mr. Barton claim there were debris in the walkway. The defense claims there was adequate

time to clean the walkway, plaintiff, Mr. Barton and a fellow roustabout, Mr. Jones, claims there was not. Therefore, defendant's Motion for Summary Judgment should be DENIED as a matter of law.

>Respectfully submitted,
>DAVIS and SAUNDERS, P.L.C.
>
>BY: *Nicholas B Castrogiovanni*
>BENJAMIN B. SAUNDERS #11733
>NICHOLAS B. CASTROGIOVANNI, #26235
>3113 Sixteenth Street
>Post Office Box 8801
>Metairie, Louisiana 70011-8801
>Telephone: (504) 837-9525
>
>Attorneys for Plaintiff,
>TRAVIS D. BARTON

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon defendant, through its Agent for Service of Process by placing same in the United States Mail, postage prepaid, this 9th day of January, 2001.

*Nicholas B. Castrogiovanni*
BENJAMIN B. SAUNDERS

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   CIVIL ACTION                    MAGISTRATE:   5
     NO.  00-0293                    SECTION "J" (1)
 5   * * * * * * * * * * * * * * * * * * * * * * *

 6                   TRAVIS D. BARTON

 7                       VERSUS

 8         GLOBAL MARINE DRILLING COMPANY

 9   * * * * * * * * * * * * * * * * * * * * * * *
```

Deposition of **TRAVIS D. BARTON**, taken in the above-titled cause, before Carol S. Wentz, Certified Court Reporter, at the offices of Davis, Saunders, Arata & Rome, 3113 Sixteenth Street, Metairie, Louisiana 70011, on September 27, 2000.

ORIGINAL

1  the main deck. I tripped and fell on a padeye,
2  striking my left knee.
3       Q.   I am going to break this down, and we
4  will go through it again.
5           What do you recall hitting your left
6  knee on?
7       A.   A padeye.
8       Q.   What part of your knee?
9       A.   The very top, right on top of the
10 kneecap.
11      Q.   It hit you straight on, on your kneecap?
12      A.   Straight on my knee.
13      Q.   Straight on the kneecap?
14      A.   Yes, sir.
15      Q.   What happened then?
16      A.   Mr. Burt Jones was there. He helped me
17 get up off the floor. Some other crew members
18 had already went up the stairs to get hold of the
19 stinger to let it down to the boat.
20          He helped me inside. The crane operator
21 had come in and looked at the knee. He woke up
22 the rig --
23      Q.   Medic?
24      A.   -- medic. The rig medic had come in and
25 looked at it and put ice on it.

```
 1   your crew was?
 2        A.   Yes, sir.  That's the two names I had
 3   given you, that and the crane operator.
 4        Q.   The crane operator was Craig Sahahn?
 5        A.   Sahahn.
 6        Q.   Tell me what happened at the time of
 7   your accident.
 8        A.   Well, we were running casing.  We had
 9   had a boat tied up that day.  We had unloaded
10   casing.  It had been storming during the day,
11   raining.  We were trying to clean the floors, get
12   stuff ready to go so we could put the casing in
13   the hole.
14             Toward the end of my tour, which was
15   actually almost time to change tours, the crane
16   operator was paying attention to the boat because
17   we had fairly rough seas.  The rope broke.  He
18   called for help.
19             I was on the upper pipe rack.  I had to
20   come down the stairs, step on the I-beam, and
21   then step on the floor to go get the stinger to
22   set it down to the boat to get the other rope off
23   so the boat could maneuver away from the rig.
24             In the process from leaving the I-beam
25   down to the floor, some debris and stuff was on
```



```
 1      Q.    It was dark, right?
 2      A.    Yes, sir.
 3      A.    It was night time but it wasn't --
 4      A.    It was night time and cloudy.
 5      Q.    You were standing on the upper pipe
 6   rack?
 7      A.    Yes, sir.
 8      Q.    What were you doing up there?
 9      A.    I was getting ready to run casing.
10      Q.    What does that involve?
11      A.    Setting up your cat walk so you can --
12   so the crane operator can send casing down and
13   they can pull it up in the hole.
14      Q.    Okay.
15      A.    It is hard to -- you kind of have to see
16   it.
17      Q.    I will do my best, but I will probably
18   ask you some stupid questions in the process.
19      A.    Okay.
20      Q.    Had the casing you were going to be
21   working with had already been --
22      A.    They had just finished the prior evening
23   or that morning when we had come on tour
24   unloading.  We had finished unloading the boat
25   and were trying, in the process, to getting
```

755 MAGAZINE STREET, SUITE 200
NEW ORLEANS, LOUISIANA 70130

AFFILIATED REPORTING TECHNOLOGY, INC.
OFFICIAL COURT REPORTERS

Ph. (504) 523-3
Fax (504) 522-4

1  cleaned up.
2       Casing has a lot of grease that goes
3  with it. We were trying to get stuff up and
4  ready to run.
5       Q. So the boat had been unloaded?
6       A. Most of it. It still had pallets of
7  chemicals on the boat.
8       Q. So just the casing had been unloaded?
9       A. Just the casing had been unloaded.
10      Q. Your job overall was that you guys would
11 start rigging things up so that you could then
12 take the casing off the pipe rack and it could
13 start going in the hole?
14      A. Yes, sir.
15      Q. Once that operation began, were you
16 going to be hooking up slings and things like
17 that?
18      A. I would be hooking up slings, putting
19 the rubber ends on the casing, whatever.
20 Sometimes I'm allowed to run the crane during the
21 casing jobs.
22      Q. When you talk about cleaning things up
23 so you could get started working, what exactly
24 were you cleaning up?
25      A. Well, if you are unloading casing,

1    After you traveled down the flight of
2 stairs and you reached the main deck area, how
3 far did you go before you tripped on the padeye?
4    A.    Probably 10, maybe 12 feet.
5    Q.    What was the lighting like in the area?
6    A.    Pretty poor.
7    Q.    Was there any particular reason?
8    A.    Basically, probably because it was
9 cloudy.
10   Q.    Is there artificial lighting on the rig?
11   A.    Artificial lighting on the rig.
12   Q.    Were all of the light bulbs working, as
13 far as you know?
14   A.    As far as I know.
15   Q.    On the main deck, was there anything in
16 the walkway or anything like that?
17   A.    We had pallets and soap buckets where we
18 had been cleaning the rig up.
19   Q.    What were you cleaning?
20   A.    The main deck, trying to clean up the
21 mess that the crew previously had made unloading
22 the casing.
23   Q.    Had you been down there on the main deck
24 helping with the cleanup?
25   A.    Yes, sir, I had.

755 MAGAZINE STREET, SUITE 200
NEW ORLEANS, LOUISIANA 70130
AFFILIATED REPORTING TECHNOLOGY, INC.
OFFICIAL COURT REPORTERS
Ph. (504) 523-
Fax (504) 522

```
 1   that is like a fixed thing --
 2        A.    I didn't trip on the padeye.
 3        Q.    That's what you hit your knee on?
 4        A.    That's what I hit my knee on.
 5        Q.    Thank you for correcting me.
 6              What did you trip on?
 7        A.    Some debris on the main deck.
 8        Q.    Would that be the pallets and soap
 9   buckets?
10        A.    Pallets and soap that was on the deck.
11        Q.    What were the pallets doing there?
12        A.    We had -- They had just emptied and
13   cleaned out our material room.  We were bringing
14   those pallets out to send those pallets to a boat
15   so we could get them off of the rig.
16        Q.    So it was your crew who had brought the
17   pallets out into that area?
18        A.    No, sir, it was not my crew.  It was the
19   crew before that had cleared out the storeroom so
20   that, once they got the casing off, that if they
21   had time, to put the other -- either the pallets
22   on the boat or bring the chemicals on the boat
23   off and put them down and send all the empty
24   pallets back to the boat.
25        Q.    And what exactly was it that you tripped
```

1  standard rules that you try to clean up.
2      Q.   Generally speaking, who are the people
3  who are responsible for keeping the walkways
4  clear?
5      A.   Roustabouts.
6      Q.   You had been on tour for about 11 hours
7  or so --
8      A.   Yes, sir.
9      Q.   -- at the time of your accident?
10     A.   Yes, sir.
11     Q.   Now, do you know if anybody got written
12 up as a result of this accident?
13     A.   I do not know.
14     Q.   So let me get a little better picture of
15 what happened after you came back.
16          After you saw the doctors in Lafayette,
17 you came back and did light duty --
18     A.   Yes, sir.
19     Q.   -- you told me for about 12 days?
20     A.   Yes, sir.
21     Q.   You went home and then had your regular
22 14 off?
23     A.   Regular 14 off.
24     Q.   Did you ride with anybody from the crew
25 change?

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4
        TRAVIS D. BARTON          CIVIL ACTION
 5                                NO. 00-0293
             versus               SECTION "J"
 6                                MAGISTRATE:   5
        GLOBAL MARINE DRILLING
 7      COMPANY

 8

 9

10           Deposition of ROBERT CRAIG SEHON,

11   given in the above-entitled cause, pursuant to

12   the following stipulation at the offices of

13   FOWLER RODRIGUEZ, 201 St. Charles Avenue, 36th

14   Floor, New Orleans, Louisiana, on Tuesday, the

15   19th day of December, 2000.

16

17                                **CERTIFIED ORIGINAL**

18        REPORTED BY:

19

20        CHERYL L. OHLMEYER
          CERTIFIED COURT REPORTER
21

22

23

24

25
```

1   A.   A workboat.

2   Q.   What was on that workboat?

3   A.   Casing was on it. I'm not sure what
4   was left on the boat.

5   Q.   Did you unload the casing off that
6   workboat, or did the crew before you unload the
7   casing off the workboat?

8   A.   Probably, both of us. That was three
9   years ago. It would be hard for me to remember.

10  Q.   If you look at that accident report,
11  can you tell how far into your shift Travis'
12  accident happened?

13  A.   He began work at 12:00. Time of
14  Incident, it was 2330. It had to be 3:30 in the
15  morning. No. 11:30, 11:30 at night. Right.
16  This is just before we knocked off.

17  Q.   So Travis' accident happened around
18  midnight?

19  A.   According to this.

20  Q.   Do you remember what time that shift
21  started that day?

22  A.   At noon.

23  Q.   It started at noon, and ya'll had 12-
24  hour shifts, 12 to 12?

25  A.   Yes.

```
 1        Q.    All right.  And I believe in looking
 2   at that accident report, you told me that the
 3   accident occurred sometime around 11:30 at night?
 4        A.    Yes, sir.
 5        Q.    Would you just in your own words,
 6   rather than me asking you questions, tell me
 7   whatever it is that you know or whatever it is
 8   that you observed that night in connection with
 9   Travis' accident.
10        A.    I didn't observe anything.  The only
11   thing I know was that Travis had tripped over a
12   padeye.  That's what I was told, tripped over a
13   padeye, and hit his knee, running across the
14   deck.
15        Q.    Do you know why he was running across
16   the deck?
17        A.    Moor line had just broke on the
18   workboat, and he was getting over there to see if
19   we could get the other rope on it.
20        Q.    Did you give any kind of order or a
21   command from your crane that ya'll had an
22   emergency situation because a line broke between
23   the workboat and the Adriatic VII?
24        A.    I just told them I needed a stinger
25   line because the boat just broke a rope.
```

```
 1  just being used to pick up the mooring line.
 2  That's the tool they use to lift --
 3              THE WITNESS:
 4                  Right.
 5              MR. FLINT:
 6                  -- lower and raise the stinger
 7  line.
 8  BY MR. SAUNDERS:
 9       Q.    Okay.  I see.  I'm with you now.
10  Thank you.  All right.
11              So then you successfully were able to
12  use your crane and lines to free the work vessel
13  from the rig?
14       A.    Right.
15       Q.    In the storm?
16       A.    Wasn't a storm.  It was rough seas.
17       Q.    In the rough seas?
18       A.    Right.
19       Q.    And then after that, your roustabouts
20  did what?
21       A.    Went back to work moving casing.
22       Q.    What assistance did they provide to
23  you in connection with that operation in freeing
24  the vessel?
25       A.    Hooking my stinger line up and
```

AFFIDAVIT

PARISH OF JEFFERSON
STATE OF LOUISIANA

BEFORE ME, the undersigned Notary Public, came and appeared:

BERT JONES

who, after being sworn, did depose and state:

1. He currently resides at 9250 Dean Road, Apt. 316, Shreveport, Louisiana;

2. He is working for Nabors Offshore;

3. He is working light duty in Houma, Louisiana currently due to being injured;

4. He has been out of the oil field since injuring his knee;

5. He was employed by Global Marine Drilling Company on March 8, 1997;

6. He was working with Travis Barton at the time of Mr. Barton's accident on March 8, 1997;

7. At the time of Mr. Barton's accident, Mr. Jones was coming out of the change room at the same time Mr. Barton was coming around the corner and he saw Mr. Barton slip/trip on a pallet in the walkway.

8. The incident occurred sometime in the evening when it was dark;

9. The weather conditions were rough enough for the boat to pop a mooring line;

10. There were designed walkways on deck and there were pallets stacked up in the walkway area with chemicals where Mr. Barton fell at the time of his accident;

11. There was some Aqua Gel on the deck;

12. Aqua Gel gets slippery when wet;

13. The pad eye that Mr. Barton hurt his knee on was the same color as the deck of the rig;

14. The job duties that he and Mr. Barton were performing were required to be done quickly. The crane operator was hollering that the boat was off the mooring line and they had to hurry to get it fixed. There was little time to stop and assess the conditions of the deck. They were in an emergency situation;

15. Usually when they are running the casings, it has to be done fast. There is not a lot of time. They do not like the cranes to be tied up with anything;

16. The oil field preaches to take your time to do what you can, but when it comes down to it, they rush you to do everything;

17. The crane operator talked to the crew about the assignment and running the casing and instructed the crew to put everything else aside for the moment so that the pipe could be moved up to the top rack so it was ready to be run.

18. Further affiant sayeth not.

_____       _____
WITNESS                                BERT JONES

_____       _____
WITNESS                                DATE  1-8-01

SWORN AND SUBSCRIBED BEFORE ME,
THIS  8  OF  JANUARY  , 2001.

_____
NOTARY PUBLIC