



FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN 16  AH 10: 23

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TRAVIS D. BARTON**<br>    **Plaintiff** | * | **CIVIL ACTION NO. 00-0293** |
| | * | **JUDGE CARL J. BARBIER** |
| **VERSUS** | | **SECTION "J"** |
| | * | |
| **GLOBAL MARINE DRILLING COMPANY**<br>    **Defendant** | * | **MAG. ALMA J. CHASEZ**<br>**MAGISTRATE: 5** |

\*     \*     \*     \*     \*     \*     \*     \*

## MOTION FOR LEAVE TO FILE REPLY
## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel, comes defendant, Global Marine Drilling

Company ("Global Marine"), and respectfully moves this Honorable Court to enter an Order granting

Global Marine leave of Court to file its Reply Memorandum in Support of its Motion for Summary

Judgment in the above referenced matter.

DATE OF ENTRY

JAN 2 9 2001

Respectfully submitted,

_____

DELOS E. FLINT, JR., T.A. (#5616)
ROBERT R. JOHNSTON (#22442)
DANIEL LICHTL (#26385)
FOWLER, RODRIGUEZ, KINGSMILL,
 FLINT & GRAY, L.L.P.
201 St. Charles Avenue, 36th Floor
New Orleans, Louisiana 70170
Telephone: (504) 523-2600
Attorneys for Defendant,
Global Marine Drilling Company

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TRAVIS D. BARTON**<br>　　**Plaintiff** | * | **CIVIL ACTION NO. 00-0293** |
| | * | **JUDGE CARL J. BARBIER** |
| **VERSUS** | | **SECTION "J"** |
| | * | |
| **GLOBAL MARINE DRILLING COMPANY**<br>　　**Defendant** | * | **MAG. ALMA J. CHASEZ**<br>**MAGISTRATE: 5** |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

## O R D E R

Considering the foregoing motion;

IT IS ORDERED that defendant, Global Marine Drilling Company, is hereby granted leave of Court to file the attached Reply Memorandum in Support of its Motion for Summary Judgment in the above reference matter.

New Orleans, Louisiana, this **29** day of **January**, 2001.

_____
U.S. DISTRICT JUDGE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TRAVIS D. BARTON | * | CIVIL ACTION NO. 00-0293 |
| **Plaintiff** | | |
| | * | JUDGE CARL J. BARBIER |
| VERSUS | | SECTION "J" |
| | * | |
| GLOBAL MARINE DRILLING COMPANY | | MAG. ALMA J. CHASEZ |
| **Defendant** | * | MAGISTRATE: 5 |

\* \* \* \* \* \* \* \*

**REPLY MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

MAY IT PLEASE THE COURT;

Global Marine Drilling Company (hereinafter "Global Marine") has reviewed plaintiff's

opposition to its Motion for Summary Judgment and notes that the plaintiff failed to adhere to

Local Rule 56.2 by failing to submit a concise statement of material facts which creates a genuine

issue to be tried.  Consequently, the court can find Global Marine's Statement of Uncontested

Material Facts admitted for purposes of its Motion for Summary Judgment.  L.R. 56.2.

In addition to failing to file a Statement of Facts, plaintiff also fails to demonstrate that

there are any genuine issues of material fact.  In the instant action, at the time of plaintiff's alleged

injury, he was working alone.  (Plaintiff's depo., p. 36).  The plaintiff admitted that during the



over six hours he was working he had approximately ten minutes between each lift, and had time to clean up the two mop buckets and pallets which were approximately 20-25 feet away from him in a walkway. (Plaintiff's depo., pp. 46, 53, 82 and 86). Part of the plaintiff's duties as a roustabout was keeping the walkway where he allegedly tripped clean and clear of obstructions. (Plaintiff's depo., p. 53). Plaintiff admits that he subsequently tripped on these pallets and/or mop buckets, injuring his left knee. (Plaintiff's depo., pp. 36 - 37). Defendant notes that the plaintiff testified that he tripped and did not slip in any foreign substance. (Plaintiff's depo., p. 70).

Plaintiff also admitted that the walkway where he tripped was not completely blocked and there was room to move around within the walkway such that a person could have avoided the objects in the walkway. (Plaintiff's depo., p. 75). Finally, plaintiff admitted that he was able to see the objects as he approached them, before he tripped on them. (Plaintiff's depo., pp. 48 and 52). Nothing cited in plaintiff's opposition controverts the above facts.

Further, the affidavit of Bert Jones submitted by plaintiff in his opposition fails to create an issue of fact and is irrelevant to the instant action. First, the plaintiff admitted in his deposition that he tripped on pallets and/or soap buckets which makes Jones' statement regarding the Aqua Gel immaterial in that the plaintiff did not slip on a foreign substance. Next, Jones' statement regarding the padeye being the same color as the rig is irrelevant because the plaintiff tripped on pallets and/or soap buckets and not the padeye. Third, the plaintiff testified that he had approximately ten minutes between loads to clean the buckets and pallets out of the walkway, which makes Jones' statement with respect to the crane operator's instructions immaterial because the plaintiff had ample time to clean his work area while running casing and before the mooring line parted. (Plaintiff's depo., p. 86). Defendant notes that Jones testifies that he was in the

2

change room immediately before the plaintiff's accident, and therefore he cannot know what happened right before the incident. Lastly, Jones' statement regarding the oilfield in general and running of casing (no. 15 and 16 of Jones' Affidavit) are conclusory statements about general conditions which do not even purport to address what was happening on the rig at the time of the accident. Consequently, the plaintiff's own testimony in his deposition renders Jones' Affidavit immaterial, and the affidavit fails to create any genuine issue of material fact.

Global Marine submits this Court's decision in Billedeaux v. Tidex, Inc., 1993 WL 21420 (E.D. La. 1993), aff'd., 3 F.3d 437 (5th Cir. 1993) (attached hereto as Exhibit "1") supports its Motion for Summary Judgment. Therein this Court found that a plaintiff could not recover against a vessel owner under Jones Act negligence or unseaworthiness where the plaintiff could have avoided his accident by taking an alternative route that was longer but safer. Further, it found that the plaintiff tripped on objects which he could have avoided or moved that would have precluded the occurrence of his accident.

As in Billedeaux, this Court should find that Travis Barton was the sole architect of his own injuries and therefore precluded from recovering under the theories of negligence and unseaworthiness. Davilla v. S/S VERCHARMIAN, 247 F.Supp. 617, 620 (E.D. Va. 1965). By his own admission, plaintiff had time to pick up the two buckets and pallets he later tripped on. Furthermore, he admits that there was room to walk around the pallets and buckets. The plaintiff tripped due to his own carelessness. As a result, there is no evidence that Global Marine breached a duty owed to the plaintiff, nor has any evidence been adduced that the ADRIATIC VII was unseaworthy. Accordingly, defendant requests that the Court grant Global Marine Drilling Company's Motion for Summary Judgment.

3

Respectfully submitted,

_____
DELOS E. FLINT, JR., T.A. (#5616)
ROBERT R. JOHNSTON (#22442)
DANIEL LICHTL (#26385)
FOWLER, RODRIGUEZ, KINGSMILL,
  FLINT & GRAY, L.L.P.
201 St. Charles Avenue, 36th Floor
New Orleans, Louisiana 70170
Telephone: (504) 523-2600
Attorneys for Defendant,
Global Marine Drilling Company

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been provided to counsel for all parties by depositing a copy of same in the United States mail, properly addressed and first-class postage prepaid on this _16_ day of January, 2001.

_____

4

1993 WL 21420
(Cite as: 1993 WL 21420 (E.D.La.))

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.

**Clinton BILLEDEAUX, Sr.**
v.
**TIDEX, INC.**

**Civ. A. No. 91-134.**

Jan. 27, 1993.

ORDER AND REASONS

CLEMENT, Judge.

I. INTRODUCTION

**\*1** Clinton J. Billedeaux, a seaman aboard the M/V LOUIS TIDE, brought suit against his employer, Tidex, Inc., under the Jones Act and general maritime law for injuries suffered while aboard the vessel on September 26, 1990. Billedeaux claims that he was injured on that date while moving a hose rack. The factual and legal questions to be resolved here are whether Billedeaux's injuries resulted from the negligence of Tidex or the unseaworthiness of its vessel, from Billedeaux's own carelessness, or from a combination of the above. Tidex has paid Billedeaux's medical expenses, and, thus, medical damages are not at issue. This case involves Billedeaux's right to recover for lost earnings and pain and suffering.

This matter was tried to the court without a jury on September 28-29, 1992. Because this case raised serious and pivotal issues of credibility, the court delayed its ruling until a transcript of trial proceedings could be prepared and consulted. Now, after considering the evidence offered at trial and the legal memoranda, the court makes the following findings of fact and conclusions of law. To the extent that a factual finding is deemed a conclusion of law, or, conversely, a conclusion of law is deemed a factual finding, it should be so considered.

II. FINDINGS OF FACT

On September 26, 1990, Billedeaux was employed by Tidex as an able bodied seaman and was immediately assigned to the LOUIS TIDE.

Billedeaux, 39 years old at the time of the accident, had worked in the maritime industry in various capacities since 1975, including ordinary seaman, able bodied seaman, and second captain of a 100 ton vessel. On one occasion, in 1989-90, Billedeaux worked as a crewboat operator for Tidewater Services, Inc.

The LOUIS TIDE is an offshore vessel that is about 165 feet in length and that weighs about 289 gross tons. At all times relevant to this dispute, the LOUIS TIDE was under the command of Captain Stephen Lane Comeaux, and was, at the time of the incident, dedicated to servicing offshore oil rigs in the Louisiana-Texas Gulf Coast area. Captain Comeaux had supervisory responsibility for housekeeping activities on the LOUIS TIDE, including the movement and storage of equipment.

On September 26, 1990, the date of Billedeaux's accident, the LOUIS TIDE was moored in waters near the Hudson Dry Dock, in Morgan City, Louisiana. Its crew was engaged in routine maintenance. The day before, the vessel had been removed from the Hudson dry dock, where it had undergone normal repairs.

On or before September 25, 1990, the LOUIS TIDE underwent a routine Coast Guard inspection. The precise date of this inspection is not known: that date was neither included on the Coast Guard Certificate of Inspection nor entered into one of the various logs kept by the vessel's crew. Moreover, at the trial of this matter, Captain Comeaux could not remember the date of the inspection. He recalled only that the LOUIS TIDE was removed from dry dock "during the work time" on September 25, 1990, and that the inspection had been completed while the LOUIS TIDE was still on dry dock.

**\*2** According to Captain Comeaux, during a "normal" inspection, the Coast Guard moves "from compartment to compartment checking off and seeing that the vessel and the equipment meets the Coast Guard's requirements." [FN1] In addition, fire and fuel hoses are assembled and placed on the deck. Although at trial Captain Comeaux could not remember where on the LOUIS TIDE's deck this equipment was assembled for this particular inspection, he agreed that it could have been assembled on the deck immediately aft the cabin

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

EXHIBIT
1

near the canopy. [FN2]

Billedeaux testified, based on past experience with such inspections, that the Coast Guard sometimes asks that fire extinguishers be put on the back deck for inspection and sometimes inspects cargo chains. [FN3] When specifically questioned about fire extinguishers, however, Captain Comeaux stated that he could not recall fire extinguishers with the other equipment being inspected, and he could think of no reason why extinguishers would have been in that location. Normal procedure on the LOUIS TIDE is "to gather the extinguishers in the galley, in one of the staterooms where the Coast Guard man can come there and inspect all of them without going throughout the vessel looking at the safety company's inspection tags." [FN4]

On September 26, 1990, the LOUIS TIDE's crew was preparing to install a new hose rack, which was to be welded into place on the deck close to the locker and cabin. The parties stipulate that the hose rack weighed about 150 pounds. The new hose rack had been lifted by crane onto the stern deck and then had been moved manually to mid-deck where it was cleaned up and painted. At the time of the incident, the hose rack was located "to the starboard side of the centerline" of the vessel. Captain Comeaux could not recall whether he watched while this particular hose rack was moved; but he stated that moving a hose rack is normally considered a two-man job.

Billedeaux reported to Captain Comeaux at 12:00 noon on September 26, 1990, and was instructed to help the first mate, Reginald P. Hebert, remove gaskets from tank covers. When he completed that task, Billedeaux was instructed by Captain Comeaux to get another seaman and move a hose rack a distance of about thirty feet from mid-deck to its permanent location near the cabin.

Captain Comeaux testified that he did not order Billedeaux to move this hose rack within any specific period of time. Billedeaux, on the other hand, testified that Captain Comeaux ordered him to find Hebert and tell him (Hebert) that "the hose rack needed to be moved into position where it had to go because that was the last day we were going to have the welders aboard, and it was getting pretty close to five o'clock and they wanted to weld that hose rack into place before five." [FN5] Billedeaux did not

mention the part about welders at his deposition on May 9, 1991, however. [FN6] Moreover, when he was deposed, Billedeaux stated that his accident occurred at 4:00 p.m.--not 4:30 p.m., as he testified at trial. [FN7]

*3 Captain Comeaux could not recall whether there were welders on board the vessel at the time of Billedeaux's accident. Neither could he recall the date on which the hose rack was welded into its permanent position.

Billedeaux repeated Captain Comeaux's instructions to Hebert. According to Billedeaux, Hebert commented (and Billedeaux agreed) that because of equipment littering the deck there was not "much of a path to go through." [FN8] Billedeaux testified at trial that he and Hebert tested the hose rack before lifting it; that he believed the two of them could move the rack the requisite thirty feet; that he requested no additional assistance; that he felt no pain upon lifting the hose rack; and that he had been trained previously in proper lifting techniques. Billedeaux also said that he told Hebert that the rack was "a little heavy." At deposition, though, Billedeaux stated that he did not tell Hebert that the rack was too heavy. [FN9] Hebert expressed no reservation about moving the rack. [FN10]

Billedeaux testified that he and Hebert decided to walk across the chains because it was the clearest path in a straight line from the location of the hose rack mid-deck to its permanent location. [FN11] The rack, Billedeaux explained, was long, and "it would be very hard to cut corners and go in a three-foot straight line and then to have to cut the corner in the opposite direction." [FN12]

Billedeaux related the subsequent events as follows:
Mr. Hebert got on the outboard end of the hose rack, I was on the inboard end, we were facing each other. We raised the hose rack high enough to clear the hose end and the fire extinguisher and started across the chain. Almost completely across the chain, my toe came in contact with something, at the moment I didn't know what. I stumbled, almost fell and I grunted, I made some sort of noise that I knew I was in pain. It was an involuntary reaction. Mr. Hebert stopped, looked at me and we looked at the space where the hose rack had to go. We only had a few more feet, so I carried the hose rack on to where it had to go.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

[FN13]

It is not clear what Billedeaux tripped on--the chains themselves, or some object resting on or near the chains. Billedeaux testified that he did not notice a butterfly valve or anything else on the chains before he started across them. In any event, Billedeaux acknowledges, as he must, that he knew that chains were "not exactly the most stable thing to walk on." [FN14]

There was confusion about what, if anything, Billedeaux told Hebert at the time of the accident. Billedeaux testified that immediately after he stumbled he told Hebert that he was having back pain. When Billedeaux was asked this question at deposition, however, he stated that he never told Hebert he was in pain. Then, on redirect at trial, Billedeaux explained that after he stumbled, he set the hose rack down, grabbed his lower back, and said in a loud voice, "I think I pulled a muscle." [FN15]

*4 Billedeaux and Hebert put the hose rack in place. According to Billedeaux, he and Hebert "returned to the hoses that were on the deck and proceeded to pick them up one by one and stack them in the hose rack." [FN16] At that point, Billedeaux noticed that he "had a lot of trouble stooping down [and] bending over." [FN17]

Shortly thereafter, Billedeaux told Captain Comeaux that he had hurt his back while moving the hose rack on the back deck. Billedeaux did not tell Captain Comeaux that he hurt his back when he tripped on chains or a butterfly valve. [FN18] Accordingly, the accident report prepared by Captain Comeaux the day after the accident does not state that Billedeaux's injuries resulted from stumbling on chains or a butterfly valve.

Billedeaux's back injuries proved serious. On July 30, 1991, he was required to undergo a lumbar laminectomy/disc excision and fusion at the Terrebonne General Medical Center.

The parties disagree vehemently on whether there was a "clear path" on the deck through which Billedeaux and Hebert could have moved the hose rack. Captain Comeaux testified unambiguously, and on several occasions, that "[i]f you were going from the stern of the vessel to the back door of the galley

... there was a clear passageway sufficient for two men to move the hose rack." [FN19] Captain Comeaux pointed out, and Billedeaux did not contest, that a number of individuals, such as office personnel, the vessel crew, and the port captain, walked back and forth in that area on the day in question without trouble. [FN20] The Captain himself had passed through the area in question several times on the day in question.

On the other hand, Billedeaux testified, equally unambiguously, that there was not a clear space, two feet wide, on the deck between the hose rack and the place in which the hose rack was to be moved. Billedeaux describes a jumble of equipment "amidship" of the vessel: chains flaked on the deck; butterfly valves near the corner of the deck; mops and brooms standing in an old metal garbage can; cases of paint; an old rope spool; fire extinguishers; hoses piled or coiled next to the chains; and aluminum ladders, one of which was an extension ladder and another a folding ladder, that obstructed the path to the cabin. [FN21] At his deposition, however, Billedeaux did not mention the obstructing ladders, the old spool, or the scrap wood. [FN22] Billedeaux also recalled that the pneumatic tank (called a "p tank") cover was "off the hole and over to one side," leaving the hatch open and laid back. (There were bulk cargo hatches to p tanks located on the port and starboard side of the vessel.) Because of this clutter of equipment, Billedeaux testified, he was forced to walk on chains to move the hose rack.

It is undisputed that there was some equipment on the deck at the time of Billedeaux's accident. There were the half-inch galvanized metal chains flaked on the starboard deck next to a p tank. Previously, the chains had been stored in a drum. [FN23] But because the drum collected water, which sped the chains' deterioration, on September 26, 1990, the crew was in the process of installing pipes on which they could be hung. The chains, which had been placed on the deck pending completion of the pipes, extended about fifteen feet from port to starboard and about ten to fifteen feet from bow to stern, but did not intrude into the center line of the vessel.

*5 There were also butterfly valves in the relevant area of the deck. Captain Comeaux could not recall the number or size of these valves, or whether they

1993 WL 21420                                                                                    **Page 4**
(Cite as: 1993 WL 21420, *5 (E.D.La.))

were valves that had been replaced or new replacement valves. He testified that the valves were "fairly light," and that "one man could move them, one at a time or two at a time." Billedeaux similarly estimated that these butterfly valves weighed less than ten pounds.

Captain Comeaux testified that, other than the chains and butterfly valves described above, he could not remember whether there was other equipment in the area of this accident. In particular, he could not recall whether paint cans had been removed from paint lockers and placed in the deck area. Neither could he recall whether p tank covers had been removed as part of the coast guard inspection.

When asked at trial whether he considered moving equipment before walking across the chains, Billedeaux responded: "[g]iven the time that we were trying to move it [the hose rack] and the deadline which the welders would be knocking off at five o'clock, we were moving the hose rack somewhere around 4:30 and, to the best of my knowledge, it would have taken more than 30 minutes to move the equipment out of the way." [FN24] Billedeaux stated that although the equipment on the deck blocking his path could have been moved, there was simply no time given Captain Comeaux's instructions. [FN25] Once again, though, Billedeaux offered a different explanation at deposition, at which he explained that he did not move any equipment prior to moving the hose rack because "he was not told to move anything else." [FN26]

Billedeaux was given an opportunity to read and sign his May 9, 1991 deposition. When asked at trial about the inconsistencies between his deposition and trial testimonies, Billedeaux stated that at the he had been in "extreme pain" and heavily sedated on medications" time of this deposition. [FN27]

This case is a stereotypical "swearing match" between Captain Comeaux and Billedeaux, in which the credibility of both witnesses is at the vortex of the trial. Billedeaux's co-worker, Hebert, was not called as a witness to substantiate Billedeaux's version of the condition of the deck or circumstances of the accident.

Based on the testimony set forth above, the court

finds that Billedeaux was injured while moving a hose rack across the chains on the LOUIS TIDE on September 26, 1990. The court also finds that there was a clear passageway on the vessel's deck of sufficient width (two feet wide) that Billedeaux and Hebert, walking one behind the other, had an unobstructed path in which to move the hose rack. The court specifically credits Captain Comeaux's testimony that there was such a path. The court further finds that Billedeaux did not use this path because it did not provide a "straight line" from where the hose rack was to where the hose rack was supposed to be moved.

But even if, as Billedeaux alleged, there had been no such clear path, the court would find that the equipment Billedeaux alleges to have blocked his path could have been moved with ease, as Captain Comeaux testified. The court credits Captain Comeaux's testimony that he did not order Billedeaux to move the hose rack before 5:00 p.m. in order that it could be welded into place before welders left the vessel. Therefore, the court must conclude that, although Billedeaux knew of a safer, albeit longer, alternative to walking across chains, he selected a less safe, but shorter, way to move the hose rack.

**\*6** The court finds that Billedeaux was not credible. As identified above, there are numerous inconsistencies, on points both significant and insignificant, between Billedeaux's deposition and trial testimony. These inconsistencies include Captain Comeaux's instructions to move the hose rack before 5:00 p.m. so it could be welded into place before the welders left the vessel; the time at which the accident took place; Billedeaux's explanation for not moving the equipment before moving the hose rack; and Billedeaux's mental and physical condition at the time of the deposition. The court finds it noteworthy that Billedeaux's recent recollections at trial and numerous recantations of earlier testimony, uniformly operated to strengthen his case. It is also significant that Captain Comeaux testified, on several occasions, that Billedeaux's version of certain facts would have been contrary to the vessel's standard procedures. Finally, the court thinks it somewhat improbable that flammable hoses would have been placed on the hose rack prior to welding. [FN28]

Finally, the court finds Billedeaux's explanations

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

for these myriad inconsistencies unconvincing.  At his deposition, Billedeaux declared that his medication (Percocet) did not interfere with his ability to understand people or the deposition proceedings.  He also never mentioned his physical discomfort or asked to stop the deposition proceedings, even though Tidex's counsel specifically asked him to do so if he found himself "feeling funny or not able to understand" what was transpiring. [FN29]  And as is standard procedure, Tidex's counsel gave Billedeaux a copy of his deposition testimony several weeks after the deposition took place with explicit instructions to read it over and correct any statements that were incorrect.  Billedeaux made no corrections to the relevant portions of his testimony, but instead signed the deposition indicating his approval of its contents.  From May 9, 1991, until the trial in September 28-29, 1992, Billedeaux never attempted to retract or disclaim those portions of his deposition testimony that he now claims were incorrect.

III. CONCLUSIONS OF LAW

Billedeaux offers five theories under which the court could find Tidex negligent:  there was insufficient crew to move the hose rack;  the crew was not properly trained;  Billedeaux was not instructed on how to move the rack safely;  Tidex should have provided a crane or other mechanical device to move the hose rack;  and the vessel was "littered with various machinery, tools and other out-of-place articles which hindered any lifting and moving equipment on the deck."  For the reasons set forth below, the court finds none of these arguments meritorious.

A. Jones Act Negligence

To prevail on his Jones Act claim, Billedeaux must prove that Tidex was negligent. [FN30]  The term "negligence" is liberally interpreted to include any breach of duty that an employer owes to its employees who are seamen, including the duty of providing for the safety of the crew.  Evidence of the "slightest" negligence is sufficient to sustain a finding of Jones Act liability.  Theriot v. J. Ray McDermott & Co., Inc., 742 F.2d 877, 881 (5th Cir.1984); Allen v. Seacoast Products, Inc., 742 F.2d 877, 881 (5th Cir.1980).  Once negligence is established, Tidex would be liable if its negligence played any part, however small, in producing

Billedeaux's injury. See Chisholm v. Sabine Towing & Transp. Co., Inc., 679 F.2d 60, 62 (5th Cir.1982).

*7 The testimony of Billedeaux and Captain Comeaux establish that training in lifting techniques, the number of crew members available to move the hose rack, and the weight of the rack did not contribute to Billedeaux's accident in any way.  Indeed, Billedeaux did not vigorously pursue these theories at trial, and perhaps viewed them as having been abandoned.  Accordingly, the court finds these theories of negligence without merit.

As to Billedeaux's central contention--that the clutter of equipment on the vessel's deck made his working conditions unsafe and required him to traverse the chains--the court finds no evidence of Tidex's negligence.  This ruling rests, of course, on the court's factual determination that, at the time of the accident, there existed a clear path of at least two feet in width, within which Billedeaux and Hebert could have safely moved the hose rack.  Tidex cannot be found negligent simply because Billedeaux and Hebert elected not to use the unobstructed passageway but elected instead to take the shortest route even though it required them to walk on chains.

B. Unseaworthiness

To sustain his unseaworthiness claim, Billedeaux must show that Tidex provided a vessel--including gear, appurtenances, equipment, and methods of operating equipment--that was not reasonably fit for its intended purpose. Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1354, reh'g en banc denied, 949 F.2d 1160 (5th Cir.1991).  A shipowner has an absolute, nondelegable duty to provide a seaworthy vessel. Id.

Unlike a Jones Act claim, unseaworthiness does not consider fault or the use of due care.  Brister v. A.W.I., Inc., 946 F.2d 350, 353 (5th Cir.1991).  The duty to provide a seaworthy vessel is "absolute and completely independent of the duty under the Jones Act to exercise reasonable care."  Johnson, 845 F.2d at 1354, citing Mitchell v. Trawler Racer, Inc., 362 U.S. 549, 550 (1960).  "[A]n inadequate or improperly manned vessel is considered unseaworthy as a matter of law."  Thezan v. Maritime Overseas Corp., 708 F.2d 175, 179 (5th

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1993 WL 21420
(Cite as: 1993 WL 21420, *7 (E.D.La.))

Cir.1983).

But, while Billedeaux need not prove that Tidex was negligent, he must show that (1) the unseaworthy condition of the LOUIS TIDE played a substantial part in bringing about or actually causing the injury, and (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness. Id. (citations omitted). The court has determined that there was a clear path on the deck of the LOUIS TIDE, even though perhaps one that was not the shortest distance. Accordingly, it concludes that the LOUIS TIDE was seaworthy.

C. Contributory Negligence

Contributory negligence is not a bar to Billedeaux's recovery under the Jones Act but serves to mitigate or apportion damages in accordance with the doctrine of comparative negligence. Gavagan v. United States, 955 F.2d 1016, 1019 (5th Cir.1992). Under both unseaworthiness and negligence theories, contributory negligence operates to apportion damages based on relative fault. The burden is on Tidex to prove that Billedeaux was liable for contributory negligence.

*8 The Fifth Circuit in Thezan considered a seaman's responsibility to use the safest method to perform his or her work:
    While the seaman's duty to protect himself is slight, the duty does exist. Bobb v. Modern Products, Inc., 648 F.2d 1051, 1056-57 (5th Cir.1981). Contributory negligence is available to mitigate a vessel owner's liability when an injured seaman has been negligent in breaching a duty to act or refrain from acting. Comeaux v. T.L. James & Co., [666 F.2d 294,] 299 [ (5th Cir.1981) ]. A seaman generally has no duty to find the safest way to perform his work. But where it is shown that there existed a safe alternative available of which he knew or should have known, a seaman's course of action can be properly considered in determining whether he was negligent. Ceja v. Mike Hooks, Inc., 690 F.2d 1191, 1195 (5th Cir.1982); Joyce v. Atlantic Richfield Co., 651 F.2d 676, 682-83 (10th Cir.1981). See also Robinson v. Zapata Corp., [664 F.2d 45,] 49 [ (5th Cir.1981) ] (where seaman knew of "several simply ways"--well-known and readily available to him--to avoid the unsafe course, he had the duty to follow safe

source of conduct). Additionally, factors such as age and experience can be considered in determining whether a seaman may properly be charged with a duty to select a safe course of conduct from among safe and unsafe alternatives. Ceja v. Mike Hooks, Inc., supra, 690 F.2d at 1195.

708 F.2d at 180-81; see also Brooks v. Great Lakes Dredge Dock Co., 754 F.2d 536, 538 (5th Cir.1984) (seaman's duty to protect himself is slight).

As stated above, having credited Captain Comeaux's testimony that a clear path existed, the court finds that no negligence on Tidex's part caused or contributed to Billedeaux's injuries. Had the court found Tidex negligent based on the cluttered state of the deck area, however, it nevertheless would have been forced to find Billedeaux 100% contributorily negligent. Billedeaux's own testimony establishes that he knew of the location of the equipment on the vessel's deck. [FN31] Accordingly, rather than take the shortest route and walk on chains, Billedeaux had a duty either to move the equipment that blocked his path or to take a slightly longer path. Moving paint cans, butterfly valves, and perhaps a ladder or two is hardly an onerous undertaking. Moreover, as a seasoned seaman and former captain, Billedeaux was well aware of the potential danger of walking over chains.

Accordingly,

IT IS ORDERED that the court finds Defendant Tidex, Inc., not negligent and the LOUIS TIDE seaworthy; IT IS FURTHER ORDERED that the plaintiff's action against the defendant is dismissed with prejudice.

FN1. See Trial Testimony, at 22.

FN2. Captain Comeaux's testimony is ambiguous on whether the fire hoses and fuel hoses, brought out for the coast guard inspection, were still on the deck on September 26, 1990. But because the court credits his testimony that the fire hoses would not have been assembled on the area of deck relevant to this dispute, the possible presence of fire hoses on the deck is of no consequence, and need not be resolved.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1993 WL 21420
(Cite as: 1993 WL 21420, *8 (E.D.La.))

Page 7

FN3. See Trial Testimony, at 102.

FN4. See Trial Testimony, at 74-75.

FN5. See Trial Testimony, at 104.

FN6. When asked about Captain Comeaux's "exact instructions" at the May 9, 1991 deposition, Billedeaux stated: "To get the other AB [able bodied seaman] and move the hose rack forward up close to the cabin where it belonged and start putting the hoses in that." See Trial Testimony, at 136.

FN7. See, e.g., Trial Testimony, at 137.

FN8. See Trial Testimony, at 104.

FN9. Billedeaux explained on cross-examination: "I think in my previous deposition I denied saying anything to that effect but, listening to testimony today and thinking for the last two years, I do recall a little something about asking Mr. Hebert something about--I made the comment that the hose rack seemed to be a little heavy and bulky, did two men normally carry it?" See Trial Testimony, at 166.

FN10. See Admissions, at 2.

FN11. See Trial Testimony, at 104, 178-79. At another point, Billedeaux offered that there was no clear two foot wide passageway "in a straight line" from where the hose rack was situated to its final position. See Trial Testimony, at 165.

FN12. See Trial Testimony, at 179.

FN13. See Trial Testimony, at 105.

FN14. See Admissions, at 2.

FN15. See Trial Testimony, at 176.

FN16. See Trial Testimony, at 107.

FN17. Id.

FN18. This point is uncontested.

FN19. Specifically, Captain Comeaux reported that this clear space was wide enough to walk "one behind the other," but could not say whether it was wide enough for "two men abreast." See Trial

Testimony, at 87.

FN20. See, e.g., Trial Testimony, at 75.

FN21. Billedeaux recalled that when he first came aboard the Louis Tide, several hours before his accident, the "back deck was very cluttered up around the cabin" and was clear toward the stern except for a few welders. He had to "look a couple of times to really pick out a route," did not see a "real clear route to the cabin," and had to carry his suitcase under his arm to get it high enough to clear some of the equipment. See Trial Testimony, at 97, 98.

FN22. See Trial Testimony, at 132-35.

FN23. Captain Comeaux testified that this drum had been removed from the deck before the date of Billedeaux's accident. See Trial Testimony, at 28.

FN24. See Trial Testimony, at 106.

FN25. See Trial Testimony, at 137.

FN26. See Trial Testimony, at 139.

FN27. See Trial Testimony, at 177.

FN28. Tidex revisited this point during its cross-examination of Billedeaux at trial:
Q: You didn't mention any time constraints in your deposition, did you?
A: Not that I can recall, no, sir. Q: And then, sir, you were going to put these hoses back in the hose rack and then the welders were going to come by and weld the hose rack down, is that right?
A; That's what I understood, yes, sir.
Q: With the hoses in the rack?
A: That's what I understood, yes, sir.

FN29. The pertinent portion of Billedeaux's deposition testimony, read by Tidex's counsel at trial, follows:
Q: Have you taken any medication today?
A: Yes, I have.
Q: What have you taken today?
A: Percocet.
Q: When did you take that?
A: Approximately 9:15 this morning.
Q: Is that the only medication you have had today?
A: That is the only medication.
Q: Does Percocet interfere with your ability to understand people?

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1993 WL 21420                                                                                Page 8
(Cite as: 1993 WL 21420, *8 (E.D.La.))

A: No, it doesn't.

Q: You understand what we are doing here today?

A: Yes, sir. Q: If at any time during this deposition you find yourself feeling funny or not able to understand what we are doing, let me know because I want to stop at that point.    You understand that?

A: yes, sir, I understand.

See Trial Testimony, at 183-84.

FN30. The Jones Act provides in relevant part that "any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury shall apply...."  46 U.S.C.App. § 688.

FN31. When asked if he had the "opportunity to observe what materials may or may not have been" in the accident area, Billedeaux relied, "yes," that he "had ample opportunity to observe, especially the material in my immediate vicinity."   See Trial Testimony, at 100.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

3 F.3d 437 (Table)
1994 A.M.C. 1103
(Cite as: 3 F.3d 437)

Page 9

(The decision of the Court is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. The Fifth Circuit by rule sets forth criteria for publication, provides for affirmance without opinion in certain circumstances, and directs that if an unpublished opinion is cited, a copy shall be attached to each copy of the brief. Fifth Circuit Rules, Rule 47.5, 28 U.S.C.A.)

United States Court of Appeals,
Fifth Circuit.

**Billedeaux**
**v.**

**Tidex [FN*]**

**NO. 93-3112**

Aug 13, 1993

Appeal From: E.D.La.

AFFIRMED.

FN* Fed.R.App.P. 34(a); 5th Cir.R. 34.2.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

37

1    the main deck.  I tripped and fell on a padeye,

2    striking my left knee.

3         Q.   I am going to break this down, and we

4    will go through it again.

5              What do you recall hitting your left

6    knee on?

7         A.   A padeye.

8         Q.   What part of your knee?

9         A.   The very top, right on top of the

10   kneecap.

11        Q.   It hit you straight on, on your kneecap?

12        A.   Straight on my knee.

13        Q.   Straight on the kneecap?

14        A.   Yes, sir.

15        Q.   What happened then?

16        A.   Mr. Burt Jones was there.  He helped me

17   get up off the floor.  Some other crew members

18   had already went up the stairs to get hold of the

19   stinger to let it down to the boat.

20             He helped me inside.  The crane operator

21   had come in and looked at the knee.  He woke up

22   the rig --

23        Q.   Medic?

24        A.   -- medic.  The rig medic had come in and

25   looked at it and put ice on it.

1   your crew was?

2       A.   Yes, sir.  That's the two names I had

3   given you, that and the crane operator.

4       Q.   The crane operator was Craig Sahahn?

5       A.   Sahahn.

6       Q.   Tell me what happened at the time of

7   your accident.

8       A.   Well, we were running casing.  We had

9   had a boat tied up that day.  We had unloaded

10  casing.  It had been storming during the day,

11  raining.  We were trying to clean the floors, get

12  stuff ready to go so we could put the casing in

13  the hole.

14           Toward the end of my tour, which was

15  actually almost time to change tours, the crane

16  operator was paying attention to the boat because

17  we had fairly rough seas.  The rope broke.  He

18  called for help.

19           I was on the upper pipe rack.  I had to

20  come down the stairs, step on the I-beam, and

21  then step on the floor to go get the stinger to

22  set it down to the boat to get the other rope off

23  so the boat could maneuver away from the rig.

24           In the process from leaving the I-beam

25  down to the floor, some debris and stuff was on

1      A.    Twenty.

2      Q.    So just so I'm clear, to get where the

3  crane operator wanted you to go, you had to go 20

4  feet down a flight of stairs and then about

5  another 30 feet?

6      A.    Yes, sir.

7      Q.    Where, during this trip, did you fall?

8      A.    On the main deck.

9      Q.    So you had already gone 20 feet, down

10  the stairs --

11      A.    I had already gone 20 feet, down the set

12  of stairs, and then stepped onto the deck.

13         MR. SAUNDERS:

14           Travis, you have to let him finish

15  asking his questions.  He gets about half of his

16  question out and then you interrupt him.

17         Remember what I told you about letting

18  him finish asking his question and then wait a

19  second and answer him.

20  BY MR. JOHNSTON:

21      Q.    Who was on the upper pipe rack with you?

22      A.    All three hands.

23      Q.    That would be Burt Jones, Doucet and --

24      A.    And me.

25      Q.    -- and you.  Okay.

48

1              After you traveled down the flight of

2    stairs and you reached the main deck area, how

3    far did you go before you tripped on the padeye?

4         A.    Probably 10, maybe 12 feet.

5         Q.    What was the lighting like in the area?

6         A.    Pretty poor.

7         Q.    Was there any particular reason?

8         A.    Basically, probably because it was

9    cloudy.

10        Q.    Is there artificial lighting on the rig?

11        A.    Artificial lighting on the rig.

12        Q.    Were all of the light bulbs working, as

13   far as you know?

14        A.    As far as I know.

15        Q.    On the main deck, was there anything in

16   the walkway or anything like that?

17        A.    We had pallets and soap buckets where we

18   had been cleaning the rig up.

19        Q.    What were you cleaning?

20        A.    The main deck, trying to clean up the

21   mess that the crew previously had made unloading

22   the casing.

23        Q.    Had you been down there on the main deck

24   helping with the cleanup?

25        A.    Yes, sir, I had.

52

1  you fall?

2      A.   I'm pretty sure Mr. Burt did.  I do not

3  know about Mr. Doucet.

4      Q.   I know I just asked you this, but let me

5  ask it a little more clearly.

6           As you were coming along the walkway and

7  you were proceeding toward the area where the

8  debris was, were you able to see the debris as

9  you were approaching it?

10     A.   Probably so.

11     Q.   The fact that the padeye was not

12  something you could see beforehand -- How do I

13  put this?

14           Did that make a big difference because

15  you had already tripped when you hit the padeye,

16  right?

17     A.   I had already tripped when I hit the

18  padeye.

19     Q.   Once you tripped, you had no say-so on

20  where you came to land?

21     A.   No, sir.

22     Q.   Now, was anybody or had anybody been

23  assigned to clear out this walkway prior to the

24  time your accident occurred?

25     A.   That, I do not know.  It is just

53

1   standard rules that you try to clean up.

2       Q.   Generally speaking, who are the people

3   who are responsible for keeping the walkways

4   clear?

5       A.   Roustabouts.

6       Q.   You had been on tour for about 11 hours

7   or so --

8       A.   Yes, sir.

9       Q.   -- at the time of your accident?

10      A.   Yes, sir.

11      Q.   Now, do you know if anybody got written

12  up as a result of this accident?

13      A.   I do not know.

14      Q.   So let me get a little better picture of

15  what happened after you came back.

16           After you saw the doctors in Lafayette,

17  you came back and did light duty --

18      A.   Yes, sir.

19      Q.   -- you told me for about 12 days?

20      A.   Yes, sir.

21      Q.   You went home and then had your regular

22  14 off?

23      A.   Regular 14 off.

24      Q.   Did you ride with anybody from the crew

25  change?

1    doing immediately before the line parted?

2        A.    As far as I know, they were sitting

3    there.

4        Q.    Do they have the engines engaged when

5    they are offloading?

6        A.    It is according to the weather.  If they

7    need them, they use them.  If they don't, they

8    don't.

9        Q.    You were talking about the weather being

10    stormy.

11            Was it raining at the time you fell?

12        A.    It wasn't raining at the time.  It had

13    rained earlier that day.

14        Q.    How much earlier?

15        A.    Probably midday to two o'clock, three

16    o'clock.

17        Q.    In the area where you fell, was it a

18    steel walkway, or was it grating?

19        A.    Steel walkway, slick steel.

20        Q.    But you didn't slip, right?

21        A.    Sir?

22        Q.    When you fell, you tripped instead of

23    slipping?

24        A.    Yes, sir, I tripped.

25        Q.    Let me see how good of an artist you

1    going down?

2       A.    From here about two foot, maybe two and

3    a half, three.   (Indicating.)

4       Q.    That's the walkway that you told us

5    there was some debris on?

6       A.    Right.   That's the only walkway you

7    have.   You can't walk on this side of the I-beam

8    because it is pipe racks and usually full of

9    drill pipes and casing or whatever at the time we

10   have on the rig.

11      Q.    How much of the walkway had debris

12   across it?

13      A.    A good bit because, like I said, we had

14   been cleaning.   We were moving stuff around and

15   trying to get stuff straighten up and cleaned up.

16      Q.    Okay.

17      A.    In between all of that, we are trying to

18   take casing from the lower pipe rack to the upper

19   pipe rack to get ready to run.

20      Q.    And was the walkway completely blocked

21   by anything?

22      A.    It wasn't completely blocked.   There was

23   room to move around, not a lot, but there was

24   stuff in the walkway.   We had soap buckets and

25   that kind of stuff.

1    Q.    And tell me what happened when you went

2    from initially cleaning when you started your

3    tour to starting to move the pipe from the main

4    pipe rack to the upper pipe deck.

5         What happened?

6    A.    Just the crane operator called and got

7    everybody together and talked about what we were

8    fixing to do.  He said we were to set everything

9    aside for that moment, get all of the pipe up on

10   the top rack to get ready to run.

11   Q.    How long did it take to transfer the

12   pipe from the main deck to the upper pipe rack?

13   A.    Probably, six hours.

14   Q.    How many mop buckets and pallets were

15   there in that walkway?

16   A.    For sure, two mop buckets, and I

17   couldn't give you a number on pallets.  It

18   probably wasn't no more than ten.

19   Q.    Did they have anything on them?

20   A.    No.  They were empty pallets stacked on

21   top of one another.  Some were loose.

22   Q.    Did you, at any time, request to be

23   allowed to move that stuff out of the walkway --

24   A.    I tried to pick up and clean up when I

25   wasn't hooking up on pipe.  That is a mandatory

1  the upper pipe rack, for about six hours until

2  all of the pipe had been lifted?

3       A.    Yes, sir.

4       Q.    How far away was the debris in the

5  walkway from where you were standing to rig up

6  the pipe to be moved?

7       A.    Probably anywhere from 20, 25 foot.

8       Q.    So would you have had time in between

9  loads to have gone onto the walkway and have

10 moved some of that stuff out of the way?

11      A.    Probably so.

12      Q.    And were all three of you guys working

13 on the main deck, or was somebody up on the main

14 pipe rack?

15      A.    Just by myself on the main deck.

16      Q.    So you were the guy doing the hook-ups?

17      A.    Yes, sir.

18      Q.    One guy can do that?

19      A.    One guy can.

20      Q.    So you played football in high school?

21      A.    Yes, sir.

22      Q.    What position?

23      A.    Whatever they needed.  Did you play one

24 more than the others?

25      A.    Middle linebacker mostly.